[No. A047992. First Dist., Div. Three. Jan. 28, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE GREGORY PAHL, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Certified for publication except as to parts II-B, II-C, and II-D. (Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Aileen Bunney and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—Lawrence Gregory Pahl was convicted of sexual battery (Pen. Code, § 243.4, subd. (a));[1] he was sentenced to six years' imprisonment. He contends that the evidence was insufficient to support the verdict and that instructional and sentencing error occurred. We find no error and affirm.

### I. *The Facts*

Appellant introduced himself to the victim, Kelly E., as she was walking to work in Ukiah on a Monday morning. Kelly was surprised and puzzled that appellant had her telephone number, which he said he got from a friend. She accepted his offer of a ride to work.

Appellant appeared at Kelly's apartment two days later, at about 5:30 or 6 p.m., on Wednesday evening, August 31, 1988; he invited her to go out for a Coke. She asked him to come back in an hour so she could get ready, and he agreed. Kelly took a shower and got dressed; she wore underpants, a bra, Levi's 501's, a button-up blouse, and high-top tennis shoes. Kelly was happy to have a date and called an elderly friend to share the news.

Appellant arrived, and Kelly got in the passenger side of his pickup truck. Appellant stopped at a store and bought a four-pack of wine coolers. He gave Kelly one and asked her if she wanted to talk and drive; she agreed. He drank fruit juice, while she drank a wine cooler.

After driving a while, appellant put his hand on Kelly's hand, which was on her leg, and asked when was the last time she had been naked with a man. Kelly said it was none of his business and that she wanted to go back to town, but appellant insisted they were driving to Boonville. He said it was only 14 miles and that they would be home in no time. Appellant told Kelly that there was a flame inside her that needed to be put out and that only he could do it. He talked to her about his previous relationships and marriages. He asked Kelly once or twice how her other boyfriends were in bed and "how big their dicks were." She said it was none of his business.

---

[1] All further statutory references are to the Penal Code.

Appellant repeatedly said that he was glad their paths met because their hearts belonged to one another and Kelly had a flame inside, and she should let herself be free. Kelly kept saying that she wanted to go home. Appellant kept putting his hand on Kelly's leg. She told him she was scared, and he said, "There's nothing to be scared of. I'm not gonna hurt you. I'm not that type of person."

When they got to Boonville, appellant stopped the truck at a delicatessen. Kelly said she already had dinner; appellant went in, leaving her in the truck for about 20 minutes. Kelly waited for appellant because she believed he would take her back to her apartment. Also, even though he left the keys, she was afraid he might be watching her and she "didn't know if he had a gun or something. [She] was scared." He returned and said that she must not have been too afraid, since she did not take his truck.

Appellant drove on the highway again, and cautioned Kelly not to fall in love with him. She kept saying that she wanted to go home. Then he turned up a logging road. She was very afraid. Appellant stopped and turned off the engine but left the lights on. He told Kelly to scoot over to him, which she did because of fear that he would hurt her. He began biting, nibbling, and sucking her neck. Appellant removed Kelly's blouse and bra, urging her to "be free." She tried to stop him from removing her clothing but he was "heavier" and "stronger." She started to cry and said she wanted to go home. She cried from this point on. Appellant bit her on the breasts, hurting her. She told him to stop; he talked about "being free."

Appellant told Kelly to lean back. She refused, and he pushed her back and got on top of her. He undid her pants and pulled her underpants down. Kelly managed to prevent appellant from removing her shoes, which meant that he could not completely remove her Levi's. He tried to separate her legs, but she was able to keep them together. Appellant orally copulated Kelly for about 10 minutes. Then he wanted to have sexual intercourse. She told him no and fought him off by pushing him away. He stuck his fingers in her vagina for about 10 minutes. Appellant asked Kelly if she wanted to "do a sixty-nine." She declined, and he said, "We'll do that next time."

Kelly continued to cry and say that she wanted to go home. Appellant told her that if she would turn over and let him bite her on her back they could go home. She complied. He bit her on the lower back. Then appellant let her get dressed. She noticed that his pants were down; he got dressed.

Appellant told Kelly that the gates to the road would be closed and that they would have to spend the night. She stated that she would get out and walk. But the gates were open. Appellant asked if Kelly's roommates got

"high"; she said yes. He rolled a marijuana cigarette, drove Kelly home, went into her apartment with her, shared the joint with her and her roommates, and left after about 30 minutes.

Kelly told her roommates what had happened, but they did not respond, apparently not realizing the significance of what she was saying. The next day at work she broke down, and her boss called the sheriff.

*Defense.* Appellant testified that Kelly gave him her name and address the day he gave her a ride to work, that he bought wine coolers at her request on the night of the incident, and that he asked and received permission to hold her hand. Appellant testified that as they were driving Kelly never said she wanted to go home and that she was not shy when he asked her personal questions such as when was the last time she had her clothes off with a man. They talked about sex easily, and Kelly indicated that she liked oral foreplay performed on her.

Appellant testified that when they started "making out or necking," Kelly was receptive. She did not say no or cry. They were hugging and kissing each other. He opened her blouse and moved her bra so he could massage, kiss, and nibble her breasts. At one point she said, "Not so hard," and he stopped nibbling. He started rubbing her crotch through her pants. She seemed to be enjoying all of this.

When appellant started to unbutton Kelly's pants, she said, "no," in what he thought was a playful way. He said, "yes," in a similar tone, thinking he could change her mind. She cooperated by lifting her weight off the seat so he could pull her pants down. He then orally copulated her. He inserted a finger in her vagina as he orally copulated her. Appellant intended all of these acts as foreplay to intercourse. Kelly pushed appellant's hand away. Their eyes met, and she began sobbing. He stopped what he was doing, hugged her, kissed her, talked to her and lay on top of her. He spoke gently to her about the "flame that grew from her tips of her fingers . . . and could burn all the way through her and make her feel loved . . . ." Meanwhile he was rubbing her vaginal area with his thumb.

Kelly stopped crying. Appellant continued to speak to her, asking her if someone had been mean to her in the past. He asked whether she wanted to make love, and she said, no, that she did not want to go any further, and that she thought they should go back. Appellant asked if he could rub her back first. She rolled over and he rubbed and kissed her back, but she seemed tense, so he stopped.

When she turned back over, appellant tried to hug her, but she would not hug him and said she thought they should go back. As they drove back,

they talked more, but appellant felt apprehensive because there had been an "intimate moment . . . and then all of a sudden, it was gone and I didn't understand how that happened." She invited him in, and they shared a marijuana cigarette with her roommates.

Appellant denied keeping Kelly with him on the side road thinking that she did not want to be there with him. He testified that he did not force her to do anything.

## II. *Discussion*

### A. *Sufficiency of Evidence*

 Appellant contends that there was insufficient evidence to support his sexual battery conviction. He relies on a theory of impermissibly inconsistent verdicts, suggesting that because the jury acquitted him of felony and misdemeanor false imprisonment, the jury must have found that no unlawful restraint occurred during the evening; therefore, it was inconsistent and improper for the jury to convict him of sexual battery by unlawful restraint. We disagree.

The question of the validity of inconsistent verdicts usually arises when a jury renders two verdicts on two different counts which are contradictory. (6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Judgment and Attack in Trial Court, § 3044, p. 3765.) Understandably, in such cases defendants, like appellant here, take the position that the acquittal is the legally correct verdict while the conviction is not. This argument has been universally rejected because inconsistent verdicts are probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant. (E.g., *Dunn* v. *United States* (1932) 284 U.S. 390, 393-394 [76 L.Ed. 356, 358-359, 52 S.Ct. 189, 80 A.L.R. 161].) In other words, if the conviction is supported by substantial evidence, it is valid because the defendant "had the benefit of the jury's compassion, rather than suffering a burden because of its passion . . . ." (*People* v. *Smith* (1931) 117 Cal.App. 530, 534 [4 P.2d 268]; 6 Witkin & Epstein, *supra*, at § 3044, p. 3765.)

Prior to 1927, appellate courts of this state did not follow this view, but held that inconsistent verdicts "would not support a judgment of conviction." (*People* v. *Andursky* (1925) 75 Cal.App. 16, 18 [241 P. 591]; 6 Witkin & Epstein, *supra*, at § 3044, pp. 3765-3766.) In apparent response to these decisions, the Legislature amended section 954 in 1927, adding the last sentence of the section, which now provides: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." (Stats. 1927, ch. 611, § 1, p. 1042; Stats. 1951, ch. 1674, § 45, pp. 3836-3837.) This

amendment made clear that each count must stand on its own, and a verdict on one has no bearing on any other. Therefore, the fact that a guilty verdict on one count is inconsistent with an acquittal verdict on another no longer compels reversal if there is substantial evidence to support the conviction. (*People* v. *Brown* (1985) 174 Cal.App.3d 762, 769 [220 Cal.Rptr. 264].) Simply put, "Consistency in the verdict is not necessary." (*Dunn* v. *United States, supra,* 284 U.S. at p. 393 [72 L.Ed. at p. 358].)

Since 1927 our courts have followed the general rule and viewed an inconsistent acquittal as the product of confusion or an act of mercy on the part of the jury, of which an appellant is not permitted to take further advantage. (*People* v. *Amick* (1942) 20 Cal.2d 247, 251-252 [125 P.2d 25]; see *Dunn* v. *United States, supra,* 284 U.S. at pp. 393-394; 6 Witkin & Epstein, *supra,* at § 3044, p. 3765.) Thus California has codified and established " 'the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons.' [Citations.]" (*United States* v. *Powell* (1984) 469 U.S. 57, 63 [83 L.Ed.2d 461, 467, 105 S.Ct. 471].)

Appellant relies on a limited judicial exception to this rule which is applicable in conspiracy cases, and was established by our Supreme Court in *In re Johnston* (1935) 3 Cal.2d 32, 34-36 [43 P.2d 541]. Defendants were charged with conspiracy and the requisite overt acts. They were also charged with separate offenses using the exact language used to allege the overt acts. The court held that when defendants were acquitted of the latter offenses, they were necessarily acquitted of conspiracy. The court acknowledged section 954 but reasoned that just as an information charging conspiracy is insufficient without an allegation of an overt act, a conviction cannot be based on an information if the defendant is acquitted of every overt act alleged in it. (*Id.,* at p. 36; Note (1937) 10 So.Cal.L.Rev. 208; 6 Witkin & Epstein, *supra,* at § 3046, pp. 3767-3768.)

Appellant here was not charged with conspiracy; the exception enunciated in *Johnston* (hereafter referred to as the conspiracy exception) does not apply. Appellant asks us to read the conspiracy exception broadly to apply to cases where conspiracy is not in issue. He relies on our statement of the rule in *People* v. *Eberhardt* (1985) 169 Cal.App.3d 292, 297 [215 Cal.Rptr. 161], where conspiracy was charged, but we described the conspiracy exception expansively as applying "where all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which he was acquitted is necessary to sustain a conviction of the crime of which he was convicted. [Citation.]"

Appellant reasons that when this broad wording is applied to the facts at bench, he must be acquitted of sexual battery, because the crime of which

he was convicted (sexual battery) includes the essential element of unlawful restraint, which is identical to the essential element of the crime of which he was acquitted (false imprisonment). Appellant's reasoning is fallacious because his premise, that the exception can apply in nonconspiracy cases, is incorrect; the conspiracy exception does not apply to nonconspiracy cases.

The conspiracy exception is limited, applying only where, as in *Johnston*, an overt act alleged in a conspiracy charge is identical to another charged offense of which defendant is acquitted. The Supreme Court decreed that under those unique circumstances, section 954 should not be construed to support a judgment of conviction for conspiracy, because the defendant has been acquitted of every charged overt act. (*In re Johnston, supra*, 3 Cal.2d at p. 36.)

Our holding is in keeping with the Supreme Court's narrow application of the conspiracy exception. For example, in *People v. Guerrero* (1943) 22 Cal.2d 183 [137 P.2d 21], defendants were charged with kidnapping by force and with conspiracy to commit rape. The wording of the alleged overt acts was that the defendants " '. . . by means of force and violence compelled [the victim] . . . against her will, to accompany them . . . .' " (*Id.*, at p. 186, italics omitted.) The jury convicted defendant Guerrero of conspiracy to commit rape but acquitted him of kidnapping by force. He alleged that his conspiracy conviction should be reversed. The Supreme Court upheld the conviction. The court held that the "gist" of the overt act was not the force but the taking of the victim to the place where the sexual offenses then occurred. Thus, proof of force was not material to the finding of the overt act, and therefore the absence of proof of the force evidenced by the kidnapping acquittal would not vitiate the verdict. (*Id.*, at p. 186.)

The *Guerrero* court carefully analyzed the *Johnston* opinion, highlighting *Johnston*'s emphasis on the fact that in that case the two counts were worded in the " '*exact*' " same language and were virtually " '*identical.*' " (*People v. Guerrero, supra*, 22 Cal.2d at p. 188, quoting *In re Johnston, supra*, 3 Cal.2d at p. 36, italics added by the *Guerrero* court.) The *Guerrero* court held that because the overt acts and the kidnapping charge before it were not in the exact same language and were not identical, the conspiracy exception did not apply. (*Guerrero, supra*, at pp. 188-189; see also *People v. Amick, supra*, 20 Cal.2d at p. 254 [a nonconspiracy case where the two offenses in issue were not " 'identical,' " and the court refused to apply the exception].)

Not only has the Supreme Court applied its conspiracy exception narrowly, but in both *Guerrero* and *Amick*, the court gave as an independent ground for its decision that section 954 alone would have supported

affirmance of the convictions even if the charges had been the same or identical. (*People* v. *Guerrero, supra,* 22 Cal.2d at p. 190; *People* v. *Amick, supra,* 20 Cal.2d at p. 254.) We read these statements as seriously undermining the continuing viability of the conspiracy exception, though the Courts of Appeal must follow *Johnston* unless the Supreme Court overrules it. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)[2]

The Courts of Appeal generally have followed the high court's lead in narrowly construing the conspiracy exception. (E.g., *People* v. *Brown, supra,* 174 Cal.App.3d at pp. 768-769; *People* v. *Calpito* (1970) 9 Cal.App.3d 212, 219-220 [88 Cal.Rptr. 64].) Nevertheless some, including this court, have stated the conspiracy exception using language broad enough to indicate that they might apply the exception to a nonconspiracy case under appropriate circumstances.

For example, in *People* v. *Hamilton* (1978) 80 Cal.App.3d 124 [145 Cal.Rptr. 429], defendant drove his car at excessive speed, racing a second vehicle down city streets. The second car struck a third at an intersection, killing four people. Defendant drove away. (*Id.,* at p. 128.) A jury convicted defendant of leaving the scene of an accident in which he was " 'involved,' " but acquitted him of racing and of displaying speed. He argued that the verdicts were inconsistent and that because he could not have been " 'involved' " in an accident except by racing or displaying speed, his conviction should be reversed. (*Id.,* at pp. 128-129.) The Court of Appeal rejected the argument. The court first quoted the relevant sentence from section 954 and cited *Amick* and other cases for the general rule that one verdict has no bearing on the other. (*Id.,* at pp. 129-130.)

Then, using language applicable to the conspiracy cases, the court said: "However, there is a limited judicial exception to this rule where all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty. [Citing *Guerrero, Johnston,* and several Court of Appeal decisions.]" (*People* v. *Hamilton, supra,* 80 Cal.App.3d at p. 130.) This broad

---

[2] We note that the United States Supreme Court unanimously reaffirmed the general rule that inconsistent verdicts are "not reviewable," and squarely rejected a proposal that it adopt a conspiracy exception, finding that the argument favoring the exception "misunderstands the nature of the inconsistent verdict problem." (*United States* v. *Powell, supra,* 469 U.S. at pp. 66, 68 [83 L.Ed.2d at pp. 469-470].) The court concluded, "[Defendant] is given the benefit of her acquittal on the counts on which she was acquitted, and it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted." (*Id.,* at p. 69 [83 L.Ed.2d at p. 471].)

statement accurately describes the conspiracy exception, but it generalizes as if the exception applies to all crimes. Because it does not, the quoted language is inaccurate and misleading.

The court went on to say, "This occurs, *for example*, where a conspiracy count alleges as the only overt act a crime set forth specifically in another count, and the defendant is found not guilty of the specific crime, but is found guilty of conspiracy; such an inconsistency invalidates the conspiracy conviction. [Citations.]" (*People* v. *Hamilton, supra,* 80 Cal.App.3d at p. 130, italics added.) The words, "for example," which we have emphasized, contribute to a misunderstanding of the rule and its exception. The words should be omitted or, better, replaced with the word "only," so that the exception is said to apply "only" in conspiracy cases.

The fact that we (*People* v. *Eberhardt, supra,* 169 Cal.App.3d at p. 297) and other Courts of Appeal have stated the narrow conspiracy exception in broad language as if it might properly be applied in nonconspiracy cases does not render that a correct statement of the law; it is not. The Legislature has decreed that an acquittal of one count shall not be deemed an acquittal on another count. The Supreme Court fashioned a very limited exception to that rule which applies only in cases where there is a conspiracy count. There is no conspiracy count here. Therefore, we reject appellant's contention.[3]

It may be, as appellant argues, that the unlawful restraint needed for sexual battery is the same as the violation of personal liberty which constitutes false imprisonment. If the conspiracy exception were applicable to nonconspiracy cases, that sameness would be significant. However, we have held it does not apply, and, therefore, we need not and do not address the issue. Nevertheless, appellant points out that the Legislature has not defined "unlawfully restrained" for sexual battery, and he urges that his conviction is not supported by the evidence. It is therefore appropriate that we turn our attention to the meaning of that phrase, an issue of first impression.

Although no reported decision in California has discussed the meaning of the term "unlawfully restrained" as it is used in the sexual battery statute,[4]

---

[3] Furthermore, the charges here are not identical. Count four of the information alleges a violation of section 236, which defines false imprisonment as the "unlawful violation of the personal liberty of another." Count three of the information alleged a violation of section 243.4, which defines sexual battery as the "touch[ing] an intimate part of another person while that person is unlawfully restrained by the accused . . . ." (See generally, Annot., What Constitutes Offense of "Sexual Battery" (1978) 87 A.L.R.3d 1250.) It is immediately apparent that the essential elements of the two offenses are not identical.

[4] This may be because the essence of the offense is seen as the touching. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 37 [252 Cal.Rptr. 525, 762 P.2d 1249] [lay concept of sexual assault

the term can be viewed as distinguishing the nonsexual physical element of sexual battery from the more wanton "force, violence, or fear" element of rape.[5] (§ 261, subd. (2).) At least the term "unlawfully restrained" in section 243.4 means that something more is required than the mere exertion of physical effort necessary to commit the prohibited sexual act. This was the holding in *State* v. *Schenck* (La. 1987) 513 So.2d 1159, in which the Louisiana Supreme Court interpreted that state's sexual battery statute. The nonsexual physical element of the statute required that the offender " '. . . compels the other person to submit by placing the person in fear . . . .' " (*Id.*, at p. 1161, fn. 3.) The 14-year-old victim and her aunt were leaving a Mardi Gras parade. The 21-year-old defendant jumped from behind a tree, grabbed the victim by the hips from behind, rubbed himself against her, reached in front, and touched or squeezed her between the legs in the pubic region. "It was a momentary event quickly concluded when the startled victim dug an elbow into the defendant and cried out, 'Pervert,' prompting the defendant to agree ('That's me') as he ran back in the direction of the parade." (*Id.*, at p. 1160.) The court found inadequate evidence of compelled submission, holding that sexual battery requires "something more than the simple forceful touching required to prove battery . . . ." (*Id.*, at p. 1163.)

We agree and hold that the unlawful restraint required for violation of section 243.4 is something more than the exertion of physical effort required to commit the prohibited sexual act. Kelly testified to something more. The facts which we have set out in detail above show all the elements of this offense. Appellant, for his own sexual gratification, repeatedly touched Kelly intimately against her will. Kelly resisted physically and verbally and expressed a desire to go home, but appellant, being heavier and stronger than Kelly, restrained her despite her pleas. The evidence of unlawful restraint was ample.

The fact that the jury, for whatever reason or no reason, chose to acquit appellant of false imprisonment on evidence that would have supported a

---

and battery described as "an unwanted sexual advance"]; *In re Keith T.* (1984) 156 Cal.App.3d 983, 986-987 [203 Cal.Rptr. 112] [inadequate evidence of touching under former statute which required skin-to-skin contact].) A few decisions mention the element without discussing its meaning. (E.g., *People* v. *Muniz* (1989) 213 Cal.App.3d 1508, 1517 [262 Cal.Rptr. 743] [holding that sexual battery is not an offense included in forcible oral copulation because sexual battery requires specific intent or purpose and restraint, but forcible oral copulation does not].)

[5] Even the meaning of the concept of "force" for purposes of rape statutes is subject to confusion. The Fourth District Court of Appeal has said, "We recognize that attempting to impose a consistent logic on a set of statutes passed at different times with different motivations is a bit like trying to take a formal portrait of a group of toddlers." (*People* v. *Kusumoto* (1985) 169 Cal.App.3d 487, 494 [215 Cal.Rptr. 347] [insufficient showing of force where victim of violation of § 289, subd. (a), was asleep].)

conviction of that offense does not compel reversal of the sexual battery conviction; section 954 prohibits that result.

B.-D.*

. . . . . . . . . . . . . . . . . . . . .

## III. *Disposition*

The judgment is affirmed.

White, P. J., and Merrill, J., concurred.

A petition for a rehearing was denied February 21, 1991, and appellant's petition for review by the Supreme Court was denied April 17, 1991.

---

* See footnote, *ante*, page 1651.