Filed 5/3/16  P. v. Gonzales CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>VICTOR RAMIREZ GONZALES,<br><br>  Defendant and Appellant. | D069452<br><br><br>(Super. Ct. No. FWV1301410) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Stanford E. Reichert, Judge.  Reversed in part and affirmed as modified.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Victor Gonzales of sexual battery by restraint. (Pen. Code § 243.4, subd. (a).)[1] Gonzales concedes the evidence supported the finding he committed a sexual battery on his then-19-year-old daughter, but contends the evidence was insufficient to support the finding he employed restraint to accomplish the battery. He argues this court should modify the conviction (§ 1260) to the lesser included offense of battery in violation of section 243.4, subdivision (e)(1).

FACTS

Where, as here, a defendant contends substantial evidence does not support his conviction, we must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We state the facts in the light most favorable to the judgment.

A. <u>The Prior Molestations</u>

In the summer of 2005, Gonzales twice molested M., his then-12-year-old daughter. On the first occasion, Gonzales told M. it was time for her to go to bed and she went to her room. A short time later, Gonzales entered her bedroom. M. was in bed lying on her back and Gonzales lay down next to her on the bed, put his hand under her shirt, and rubbed her breasts. She pretended to be asleep, hoping he would stop. He did not stop, but instead moved his hand under her pajama shorts and rubbed the outside of

---

[1]     All further statutory references are to the Penal Code.

her vagina. She knew what he was doing was wrong but was scared and remained frozen and said nothing. Gonzales then got up, apologized, and said not to tell anyone. He then kissed her on the head, told her goodnight, and left the room.

Gonzales again molested M. a few weeks later. On the second occasion, M. and her then-six-year-old sister were asleep in a guest bedroom when Gonzales entered the room. Gonzales shook her shoulder to wake M. He lay on the bed and rubbed her "all over," including under her pants on her vagina. Gonzales woke M.'s sister and told her to go to another room, but her sister fell back asleep. Gonzales then left the room.

B. The Fallout from the 2005 Molestations

M. eventually reported the first, but not the second, incident to the authorities in the fall of 2005. Gonzales was charged and, in February 2006, entered a plea agreement to plead guilty to a felony offense. He entered the plea agreement to avoid prison and, under the agreement, he was placed on felony probation but was not required to register as a sex offender.

By the end of 2005, Gonzales and M.'s mother had separated and ended their relationship. Gonzales and M.'s brother went to live with Gonzales's parents and M. and her two sisters stayed with their mother. Gonzales resumed visiting M. about four months after the molestations in a supervised setting, and the visits became more frequent as time went on.

Their relationship improved over time, and M. tried to forget about what happened and work on getting closer to Gonzales. However, he was on occasion verbally abusive

3

to M. She felt that Gonzales, as her father, was superior to her and "whatever he says[,] goes," and she felt she had to do what he said.

C. <u>The Current Offense</u>

On December 1, 2012, a mutual friend of Gonzales and M., who played on the same softball team as they did, was having a going away party they planned to attend. Gonzales asked M., then 19 years old, to act as the designated driver and to pick him up from his house and drive them to and from the party (only about 10 minutes from Gonzales's home), and M. agreed. They drove Gonzales's car to the party because her car was low on gas. Gonzales drank a lot and became extremely intoxicated at the party, while M. had only a small amount of beer over the course of the party.

M., who had to coax Gonzales to leave the party, drove back to Gonzales's home. When they arrived at his home, they saw some neighbors having a small party in their garage. M. wanted to return to her home, but Gonzales convinced her to join him at the neighbors' party. They stayed a while at the neighbors' house, and Gonzales continued to drink while M. also consumed some beer. They were later joined at the neighbors' house by M.'s cousin (Robert), along with Robert's girlfriend and another friend, and continued drinking.

After midnight, M. and Gonzales, accompanied by Robert and his friends, went back to Gonzales's home.[2] He was "trashed," but the group continued drinking at his

---

[2] M. had wanted to stay longer at the neighbors' party, to hang out with the young man hosting the party, but Robert would not leave M. there because she was the only

4

home.  Around 1:30 a.m., Robert's group left, and M. went to her room.  She did not want to drive because of her alcohol consumption.

After the group left, M. was in her room with the light on, waiting for her boyfriend to call her back.[3]  M. was lying on her stomach and facing away from the door to her bedroom when she heard Gonzales open the door and enter the room.  She did not move, but instead pretended to be asleep because she did not want any interaction with Gonzales while he was drunk, because he was verbally "mean" when he was drunk.  Gonzales kicked the mattress a few times, but M. continued to feign sleep and neither person spoke.  Gonzales then closed the door, turned off the light, and returned and knelt by the mattress.  M. was scared, but continued to feign sleep to avoid any confrontation.  Gonzales touched M.'s buttocks over her pants, and M. felt paralyzed because she knew what he was doing based on what he had done to her when she was 12.  His hand then rubbed the inside of her thigh, and touched her breast over her bra, and then moved his hand down under her pants and panties and touched her vagina.  Up to that point, she felt

---

female and appeared to Robert to be highly intoxicated.  M. did not believe she was intoxicated.

[3]     Gonzales's recollection of what occurred after the group left differed significantly from M.'s version.  He testified that M. was drunk and, after Robert's group left, Gonzales saw M. lying face down in the hallway.  He claimed he grabbed her under her armpits to drag her into the bedroom, and when he was grabbing her knee and belt loop to get her whole body onto the mattress, she suddenly jumped up and ran outside.  Other defense witnesses testified she drank excessively that night, and had a tendency to be overly dramatic in order to garner attention, and did not believe her version of what happened that night.  However, because we must view the facts in the light most favorable to the judgment when assessing Gonzales's claim on appeal (see fn. 2, *ante*), we need not discuss Gonzales's version in detail.

she couldn't move because he was between her and the door, and she felt paralyzed. However, when he touched her vagina, M. realized she needed to get up to prevent him from touching her. She jumped up, asked "what the hell he was doing," and ran from the room.

M. ran outside, called her mother, and reported Gonzales's actions. She took shelter at the neighbors' house until the police and M.'s stepfather arrived.

A psychologist provided her expert opinion about the complicated feelings a victim of child molestation can have towards the father who molested the victim. She testified feeling paralyzed is not an uncommon response to trauma by persons suffering from child sexual abuse accommodation syndrome, because some will respond by pretending to be asleep, others will experience feelings of paralysis, and others will feel physically numb.

## ANALYSIS

On appeal, Gonzales concedes M.'s testimony, viewed most favorably in support of the judgment, supports the finding he committed a sexual battery on her. However, he contends the evidence was insufficient to support the finding he employed restraint to accomplish the battery.

A. Legal Standards

Gonzales was charged with and found guilty of violating section 243.4, subdivision (a), which provides:

> "Any person who touches an intimate part of another person while
> that person is unlawfully restrained by the accused or an accomplice,
> and if the touching is against the will of the person touched and is

6

for the purpose of sexual arousal, sexual gratification, or sexual abuse, is guilty of sexual battery. A violation of this subdivision is punishable by imprisonment in a county jail for not more than one year, and by a fine not exceeding two thousand dollars ($2,000); or by imprisonment in the state prison for two, three, or four years, and by a fine not exceeding ten thousand dollars ($10,000)."

Section 243.4, subdivision (e)(1), provides that the same touching, if unaccompanied by the requisite restraint, constitutes "misdemeanor sexual battery, punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment." It is the additional culpable conduct of the exertion of "unlawful restraint," whether by the accused or an accomplice, which the statutory scheme contemplates will elevate the unlawful touching from a misdemeanor to a felony and trigger the additional statutory punishment.

The courts have recognized that "the unlawful restraint required for violation of section 243.4 is something more than the exertion of physical effort required to commit the prohibited sexual act." (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1661 (*Pahl*), citing and agreeing with *State v. Schenck* (La. 1987) 513 So.2d 1159 (*Schenck*).) However, the courts have also recognized that this "something more" (the unlawful restraint) need not be physical in nature and " ' "may be accomplished by words or acts . . . ." ' " (*People v. Grant* (1992) 8 Cal.App.4th 1105, 1112 (*Grant*).) The *Grant* court, rejecting the defendant's claim that the restraint can only be exerted by a defendant who employs personal violence or threats of personal violence, explained, "There are many situations [in which] one is compelled, i.e., forced, to do something against one's

7

will but the compulsion does not involve personal violence or threats of personal violence. This is especially true when the person involved in the compulsion is an authority figure or posing as a person in authority. The force is a psychological force compelling the victim to comply with the orders of the authority figure." (*Ibid.*) Thus, *Grant* recognized that, when the "words, acts or authority of the perpetrator aimed at depriving the person's liberty" (*People v. Arnold* (1992) 6 Cal.App.4th 18, 28 (*Arnold*)) emanate from an authority figure, the requisite "force" can encompass the psychological force that operates on the victim to induce the victim to "comply with the orders of the authority figure." (*Grant,* at p. 1112.)

In *Arnold, supra,* 6 Cal.App.4th 18, on which *Grant* relied (*Grant, supra*, 8 Cal.App.4th at p. 1111), the court examined the statute and concluded that, even when the defendant has not physically restrained the victim, the defendant could nevertheless violate the statute when the victim's "liberty is being controlled by words, acts or authority of the perpetrator *aimed at* depriving the person's liberty, and such restriction is against the person's will . . . ." (*Arnold,* at p. 28, italics added.) The *Arnold* court, which examined two convictions for sexual battery by restraint, carefully distinguished the evidence of "restraint" and concluded the evidence on one count (count VI) *did* provide sufficient evidence to support the conviction (*id*. at p. 31), while the evidence on the other count (count I) *did not* provide sufficient evidence to support the conviction. (*Id*. at pp. 28-30.)

The *Arnold* court noted, as to count I, that the victim voluntarily accompanied the defendant (a teacher) to a stadium and, while there, the defendant told the victim to

8

"come here"; when she walked over to him he grabbed her and committed the touchings. However, when the victim realized she did not want the conduct to continue, she pushed him away, told him no, and successfully escaped the restraints imposed by the defendant. (*Arnold, supra,* 6 Cal.App.4th at pp. 28-29.) The People argued the defendant restrained her because he was "an authority figure for her" whom she "looked up to," and his touching restrained the victim because the touching placed her "under his physical control, and limited or restricted her freedom . . . [because] her physical ability to move away was curbed or limited, as he physically restrained her with his hands under and inside of her clothing." (*Id.* at p. 29.) Rejecting that argument, the court noted *Pahl's* caution that "something more is required than the act itself of [the unlawful touching]." (*Arnold,* at p. 29.) Because there was no evidence that "at the time defendant [committed the touching, the victim's] submission was unwilling *and compelled by defendant's words, acts or authority*," there was insufficient evidence of "something more" by the defendant (apart from the acts inherent in the touching itself) on which to premise a finding of restraint. (*Ibid.*)

In contrast, the *Arnold* court did find substantial evidence the defendant did "something more," *apart* from the restraint inherent in the acts necessary to accomplish the touching itself, to support a finding of restraint in connection with count VI. In the conduct underlying count VI, the defendant called the victim into an unoccupied room, closed the door and braced the door with a mat against it so it could not be opened, and directed her to come to him (despite her obvious efforts to move away from him), to which she submitted. He then committed the touching, after which she left through a

9

different door.  (*Arnold, supra,* 6 Cal.App.4th at pp. 22-23.)  The court concluded defendant, by calling her into an unoccupied room and then creating a blockage of the victim's main avenue of escape, increased her feelings of isolation, and the defendant (who knew of her fear of him) nevertheless used his position as an authority figure to call her to him to accomplish the prohibited sexual touching.  *Arnold* reasoned this provided evidence the defendant did something more (apart from merely engaging in conduct necessary to accomplish the touching) from which "[a] reasonable jury could have concluded that the coercive atmosphere created by defendant was such that Virginia's liberty was being controlled by defendant's words, acts and authority against her will and that she was unlawfully restrained."  (*Id*. at p. 31.)

Distilling these authorities, we believe the appropriate approach involves applying the following principles.  First, when assessing the "restraint" element, the restraining conduct by the defendant must be apart from and in addition to the conduct the defendant necessarily engaged in to commit the prohibited sexual act.  (*Pahl, supra,* 226 Cal.App.3d at p. 1661.)  The additional restraining conduct is of course satisfied when that additional conduct involves bodily constraints on the victim's freedom of movement to facilitate accomplishment of the prohibited sexual act.  However, a defendant may also apply restraint—i.e., constraining the victim's freedom of movement to facilitate accomplishment of the prohibited sexual act—by employing words or acts calculated to (i.e., "aimed at," see *Arnold, supra*, 6 Cal.App.4th at p. 28) produce the same result as physical restraint by substituting "psychological force compelling the victim to comply with the orders of the authority figure."  (*Grant, supra,* 8 Cal.App.4th at p. 1112.)

10

B. <u>Analysis</u>

The question we must examine is whether, in addition to and apart from the physical conduct required to accomplish the sexual touchings themselves, there is substantial evidence in the record as a whole from which a jury reasonably could have found (*People v. Johnson, supra,* 26 Cal.3d at p. 578) that Gonzales did "something more" to control M.'s liberty by employing words, acts or authority "aimed at" depriving M. of her liberty to enable Gonzales to accomplish the touching against her will. (*Arnold, supra,* 6 Cal.App.4th at p. 28.)

On the issue of whether the requisite "restraint" was present, the principal theory articulated by the prosecution below (on which the People on appeal also rely) was that M. testified she "froze" and was "mentally" restrained because of how Gonzales had acted seven years earlier and because of his status as an authority figure to whom she knew she had to submit. However, the fact M. subjectively *felt* restrained or frozen cannot alone provide evidence that Gonzales did "something more" by his words or acts (apart from the conduct necessary to accomplish the touching, consisting of entering the room and kneeling down next to her to achieve the proximity necessary to accomplish the battery) that was "aimed at" or calculated to control her liberty. In *People v. Espinoza* (2002) 95 Cal.App.4th 1287, the court examined an analogous statute that imposed increased punishment where the lewd act was accomplished by (among other things) the use of "duress." (*Id.* at pp. 1318-1319.) The finding of duress was based on the fact the defendant was an authority figure on whom the child victim was dependent, the size and age disparities, and because the victim had been "paralyzed" by her fear of the defendant.

11

(*Id.* at p. 1319.)  The court, after noting the defendant did not grab, restrain or corner the victim, but simply lewdly touched a victim who made no oral or physical response to his acts, concluded the duress element lacked substantial evidentiary support, explaining:

> "The only way that we could say that defendant's lewd act on L. . . . [was] accomplished by duress is if the mere fact that he was L.'s father and larger than her combined with her fear and limited intellectual level were sufficient to establish that the acts were accomplished by duress.  What is missing here is the ' "direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." '  [Quoting *People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1579.]  Duress cannot be established unless there is evidence that 'the victim['s] participation was impelled, at least partly, by an implied threat . . . .'  (*Id.* at p. 1580.)  No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind.  While it was clear that L. was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her.  It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation."  (*People v. Espinoza, supra,* 95 Cal.App.4th at p. 1321.)

Similarly, the fact M. felt restrained—because her fear of Gonzales's impending conduct (while eminently justifiable) produced a psychological paralysis that temporarily immobilized her—is not evidence that Gonzales did or said anything, apart from the acts necessary to accomplish the touching itself, calculated to or aimed at employing a "psychological force compelling the victim to comply with the orders of the authority figure." (*Grant, supra*, 8 Cal.App.4th at p. 1112.)  To hold otherwise would, to paraphrase *Espinoza*, require us to conclude that although "it was clear that [M.] was

12

afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to [molest her seven years earlier]. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by [restraint] based on an implied threat of molestation."

The People's reliance on Gonzales's *status* as an authority figure is less persuasive. Although M. testified that Gonzales (both as her father and as a male) routinely exerted his dominance and authority over her and she was not permitted to question his authority, there was no evidence he used words or conduct during the present molestation aimed at capitalizing on that authority to obtain her compliance or control her liberty to accomplish the touching. For that reason, neither *Arnold* nor *Grant* provides support for the People's argument.

In *Arnold,* the court noted the defendant took advantage of his position as an authority figure both to induce the victim to accompany him into an unoccupied room and, once isolated inside the room, to direct her to submit to his command that she come within his reach (despite her efforts to move away from him), after which he committed the touching. (*Arnold, supra,* 6 Cal.App.4th at pp. 22-23.) Under these circumstances, *Arnold* concluded the victim's "liberty was being controlled by defendant's words, acts and authority against her will and that she was unlawfully restrained." (*Id*. at p. 31.)

Similarly, in *Grant*, the victim was with her boyfriend in a car parked on privately owned property when the defendant approached the car. The defendant represented he worked for the company that owned the property and also was working with the police on vandalism problems in the area, and ordered the victim from the car. The defendant then

13

walked her to the rear of his vehicle, while ordering the boyfriend to remain in his car, and told the victim she would get in trouble if she did not cooperate with him. While questioning her, the defendant committed the touchings. (*Grant, supra,* 8 Cal.App.4th at p. 1108.) The *Grant* court concluded the victim was unlawfully restrained within the meaning of section 243.4, subdivision (a), because the victim "was ordered from the car by defendant, who presented himself as an authority figure. He grabbed [her] arm while he removed her from the car. . . . Defendant continually threatened [the victim] they . . . might be in trouble if she did not cooperate with him and that the police might be summoned to take them away. Clearly [the victim's] liberty was being controlled by defendant's words, acts and authority. Defendant's conduct forced [the victim] to remain where she did not voluntarily wish to be." (*Grant,* at p. 1113.)

Thus, in both *Arnold* and *Grant*, it was not the *status* of the defendant as a perceived authority figure that constituted the "something more" that accomplished the requisite restraint, but it was the words and actions exerting that position of authority that supplied the requisite restraint. It is undisputed that defendant did not compel M. to enter the bedroom, or compel her to remain immobilized while he committed the touching, by any words or gestures exploiting his position as her father or as a dominant male, which renders both *Arnold* and *Grant* inapposite here.

Because we conclude that neither M.'s *subjective* reaction to Gonzales's presence nor Gonzales's *unexploited* status as an authority figure can provide the "something more" necessary to support a finding of restraint, we are left only to examine whether the evidence of Gonzales's *conduct* could arguably constitute the conduct by him that was

14

calculated to apply either physical constraints on M., or to apply psychological force aimed at coercing M. into submitting to his control. The evidence was that M. was in her room, feigning being asleep, when Gonzales opened the door to the room and entered. He then closed the door, approached the bed where M. appeared to be sleeping and, when his efforts to rouse her produced no apparent results, he knelt down next to her and began to accomplish the course of touching. Moments after the touching began, she jumped from the bed, asked "what the hell he was doing," and ran from the room without impediment.

We cannot perceive, and the People do not explain, how Gonzales's course of conduct—apart from closing the door behind him[4]—comprised anything beyond the minimal conduct integral to accomplishing the touching itself. Because *People v. Pahl, supra,* 226 Cal.App.3d 1651 recognized the unlawful restraint element of section 243.4 requires "something more than the exertion of physical effort required to commit the prohibited sexual act" (*Pahl,* at p. 1661), we must examine whether the non-integral conduct (of closing the door behind him) provides substantial evidence of conduct by Gonzales calculated to apply either physical constraints on M., or to apply psychological force aimed at coercing M. into submitting to Gonzales's control.

The People argue that Gonzales did "something more" because, in an "obvious attempt to restrict her liberty," he closed the bedroom door after he entered. However, it is undisputed he did not lock the door or otherwise place any obstructions to inhibit her

---

4    The People also suggest that the "something more" included kneeling down next to the bed. We explain below why we are unpersuaded by that claim.

15

from freely opening it and leaving through it once she reacted to his touching, rendering this case factually distinct from the conduct that supported count VI in *Arnold, supra,* 6 Cal.App.4th 18.[5] Moreover, we are unpersuaded by the People's implied argument that closing the door provided evidence from which a jury could have inferred Gonzales was conveying a nonverbal signal to M. that he was restricting her ability to leave the room. M. testified she was facing away from Gonzales and pretending to be asleep when he entered and closed the door, and that she continued to pretend she was sleeping until the moment she jumped up and fled. We are unable to reconcile M.'s version of the events— that she conveyed to Gonzales the impression she was sleeping—with the inference that the People advocate, because conveying a nonverbal signal to an apparently unconscious person cannot be "*aimed at* depriving the [unconscious] person's liberty . . . against the person's will . . . ." (*Arnold, supra,* 6 Cal.App.4th at p. 28.) Simply stated, a defendant cannot calculate that his conduct will convey an implied threat that the victim's liberty will be restrained against her will when the intended recipient of his message appears to lack the ability to receive and process the message due to unconsciousness.

---

5    To the extent *Arnold* provides any guidance, the conduct underlying Count I appears more apposite. There, the People argued the defendant restrained the victim by a combination of his position as an authority figure, and because he restrained her because his touching placed her "under his physical control, and limited or restricted her freedom . . . [because] her physical ability to move away was curbed or limited . . . ." (*Arnold, supra,* 6 Cal.App.4th at p. 29.) *Arnold rejected* that argument and found insufficient evidence of restraint, noting that once the victim decided to reject the touching, she was quickly freed from any restrictions, and her "submission was [not] compelled by defendant's words, acts or authority." (*Id*. at p. 29.)

16

The People also appear to argue that Gonzales, when he knelt down next to the bed, was blocking her egress from the room, and this "blocking" comprised the "something more" on which to premise a finding of restraint, presumably because it conveyed some nonverbal signal to M. that he was restricting her ability to leave the room. We are unpersuaded by this argument, for several reasons. First, although Gonzales did kneel down, it appears this action was integral to the conduct constituting the touching (because kneeling was the only way for Gonzales to obtain sufficient proximity to come within reach of her body) and hence cannot constitute the "something more" required to support a finding of restraint. Second, even assuming Gonzales's kneeling position resulted in him being positioned between the door and the bed, M. testified his position did not impede her departure when she reacted to his touching and decided to leave. To the contrary, M. testified that when she jumped up, Gonzales reacted to her first manifestation of consciousness by immediately moving backwards away from her with his hands up at shoulder height, thus instantly removing any block to her egress and freeing her to flee the room without any impediment.

In *State v. Schenck, supra,* 513 So.2d 1159, relied on by *Pahl, supra,* 226 Cal.App.3d 1651 for the proposition that "the unlawful restraint required for violation of section 243.4 is something more than the exertion of physical effort required to commit the prohibited sexual act" (*Pahl, supra,* 226 Cal.App.3d at p. 1661), the Louisiana court examined a similar statute under similar circumstances. In *Schenck*, the victim was leaving a Mardi Gras parade when the defendant jumped from behind a tree, grabbed her by the hips from behind, rubbed himself against her, reached in front and touched or

17

squeezed her between the legs. However, the assault ended almost immediately because the victim dug an elbow into the defendant and cried out, "Pervert," prompting the defendant to flee. (*Schenck,* at p. 1160.) Examining whether there was sufficient evidence to establish the statutory requirement that the victim's submission to the proscribed sexual conduct was compelled (*ibid.*), *Schenck* concluded (as did *Pahl*) that "sexual battery requires something more than the simple forceful touching required to prove battery; [it requires] a showing that the victim was *compelled to submit* to the sexual touching . . . ." (*Schenck,* at p. 1163.) *Schenck* concluded the evidence was insufficient because, although the victim "may have frozen momentarily and [was] startled, . . . she did not submit. As soon as she could determine what to do, she elbowed the defendant and caused termination of the encounter. There is a deficiency of proof as to the element of compulsion here, and thus insufficient evidence of an essential element necessary for a conviction of sexual battery. [Citations.] The force exhibited by this defendant was merely that necessary to accomplish the non-consensual sexual touching." (*Ibid.*)

Similarly, although Gonzales kneeling next to the bed may have momentarily placed himself between M. and the door, it involved no conduct beyond that necessary to place himself in sufficient proximity to M. to accomplish the touching, and any momentary impediment evaporated the instant M. reacted to the touching. Finally, to the extent the People claim a jury could have found that Gonzales's kneeling between M. and the door constituted the requisite restraint—because the jury could have inferred such kneeling was aimed at conveying a nonverbal signal to M. that he was restricting her

18

ability to leave the room—we reiterate M.'s apparent unconsciousness is irreconcilable with a finding Gonzales was using nonverbal cues to communicate he was restraining her freedom.[6]

C. Conclusion

We conclude there is insufficient evidence to support the finding that Gonzales employed restraint, within the meaning of section 243.4, subdivision (a), to accomplish the unlawful touching. However, the evidence amply supports a conviction for the lesser included offense of violating section 243.4, subdivision (e)(1). Accordingly, we are empowered under section 1260 to reverse the judgment for violating section 243.4, subdivision (a), and modify the judgment to reflect a conviction for violating section 243.4, subdivision (e)(1). (See *People v. Muszynski* (2002) 100 Cal.App.4th 672, 683-684 [where evidentiary insufficiency goes only to the degree of the offense for which the defendant was convicted, appellate court may reduce the conviction to a lesser degree and affirm judgment as modified, thereby obviating necessity for retrial].)

## DISPOSITION

The judgment is reversed. Defendant's conviction for sexual battery by restraint under Penal Code section 243.4, subdivision (a), is reduced to battery under Penal Code

---

[6]    M.'s testimony was that, the moment she broke from her feigned unconsciousness, Gonzales reacted to her first manifestation of consciousness by moving backwards away from her with his hands up at shoulder height, which immediately removed himself from blocking her egress, and she in fact fled the room without any impediment. To the extent Gonzales was using physical cues to communicate with a *conscious* M., it signaled her freedom to leave rather than blocking her movement.

section 243.4, subdivision (e)(1), and, as so modified, the judgment of conviction is affirmed. The matter is remanded to the trial court for resentencing.

McDONALD, J.

WE CONCUR:

HALLER, Acting P. J.

IRION, J.