Filed 10/2/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C083898 |
| Plaintiff and Respondent, | (Super. Ct. No. 62129149) |
| v. | |
| ALFREDO ALEXANDER MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Placer County, Garen J. Horst, Judge.  Modified and Remanded.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Daniel B. Bernstein,

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I, II, and IV of the Discussion.

1

Supervising Deputy Attorney General, and Jennifer M. Poe, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and two codefendants were charged in connection with a "drug rip" which, essentially, is a supposed drug transaction that is a pretext for a robbery. A jury found defendant guilty of robbery in the second degree, active participation in a criminal street gang, criminal conspiracy, being an active participant in a criminal street gang having a concealed firearm, and recruiting a minor into a criminal street gang. The jury found true several firearm enhancements and an on-bail enhancement, and the trial court sentenced defendant to an aggregate term of 16 years eight months in prison.

On appeal, defendant contends that: (1) the Penal Code section 12022.53, subdivision (e) (statutory section citations that follow are to the Penal Code in effect at the time of the charged offenses), firearm enhancement on count two must be stricken because it is impermissibly inconsistent with the jury's failure to reach a finding on the section 186.22, subdivision (b)(1), gang enhancement allegation attached to count two, (2) the sentence imposed and stayed on the section 12022, subdivision (a), enhancement attached to count two must be stricken because the jury did not make a true finding as to that enhancement allegation, (3) the verdict on count eight, recruiting a minor for participation in a criminal street gang, was not supported by substantial evidence, and (4) following the passage of Senate Bill No. 620, the matter must be remanded to afford the trial court the opportunity to exercise its discretion to strike the section 12022.53, subdivision (e), firearm enhancement.

The Attorney General concedes, and we agree, that the trial court improperly imposed and stayed sentence on the section 12022, subdivision (a), enhancement attached to count two. The Attorney General also agrees, as do we, that the matter must be remanded to afford the trial court the opportunity to exercise its discretion to strike the

2

section 12022.53, subdivision (e), firearm enhancement attached to count two. Otherwise, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Defendant and codefendants Travis Lee Layton and Charles Allen Maravilla, III, were charged by first amended consolidated information. Defendant was charged with conspiracy to participate in a criminal street gang (§ 182.5; count one; we note that the first amended consolidated information erroneously identified the statute applicable to count one as Health and Safety Code section 182.5; robbery in the second degree (§ 211; counts two and three); active participation in a criminal street gang (§ 186.22, subd. (a); count four); conspiracy to commit a crime (§ 182, subd. (a)(1); count five); carrying a concealed stolen firearm in a vehicle (§ 25400, subd. (c)(2); count six); being an active participant in a criminal street gang having a concealed firearm (§ 25400, subd. (c)(3); count seven); and soliciting or recruiting a minor for participation in a criminal street gang (§ 186.26, subds. (a), (d); count eight). The first amended consolidated information also alleged numerous gang and firearm enhancements, discussed, as relevant, *post*. Finally, the information alleged an on-bail enhancement against defendant. (§ 12022.1.)

### *The Prosecution Evidence*

We note at this point that there are a number of digital communications described in this opinion. It appears that, for the most part, they were Facebook Messenger messages. We use terms addressed to Facebook Messenger and text messaging interchangeably due to occasional vagueness in the trial testimony. This has no impact on any issue presented on appeal.

On March 7, 2014, Michael Chavez, also known as Angel, exchanged messages on Facebook with Sammy Choi. Chavez, who testified under a grant of use immunity, was asking Choi where he could get pills referred to as "Norcos." Choi arranged for

Chavez to communicate with Maravilla, and, the next day, Chavez began messaging with Maravilla. These discussions continued over the next several days.

On March 8, in a Facebook message, Maravilla informed Chavez, " 'I'm on my boys phone number,' " and " 'I'm using that number, and . . . you can text me on it.' " The number Maravilla gave to Chavez was a number of a phone used by Danny Cox.

Maravilla eventually passed Chavez off to someone else named Tyler. Chavez abandoned his plan to purchase Norcos and suggested instead that he sell an ounce and a half of marijuana to Tyler.

Meanwhile, on March 9, defendant and Maravilla were exchanging Facebook messages talking about their need to make money. On March 10, the Cox phone Maravilla was using texted to an unidentified number, " 'Well im still trying to rob that kid. Other than that, I can't find anything right new now.' " On the same date, defendant sent a message to Gabriel Aquino, who was affiliated with the Norteño gang, saying, " 'i gotta talk to you in person asap im coping the thang homie!' " Defendant sent a message to Maravilla stating, " 'im getting that fool for the banger, it's fuck wet homie.' "

Sergeant David Buelow, who testified as an expert in the areas of drug sales, possession of drugs for sale, and drug-related robberies, testified that "banger" is a slang term for gun.

Defendant then texted Aquino, " '45 fat af niggah I seen another pick and my bro gabe seen it in person and erase msg.' " Buelow testified that "45" was a reference to a gun and that "the af means 'as fuck,' so that actually says, 'fat as fuck,' and what that is saying is -- in this terminology, the word 'fat' is positive, it's cool."

Aquino texted defendant, " 'AHA! ! wen yu finna copp it.' " According to Buelow, this message meant, "When are you going to get it?" Defendant responded, " 'tomaro.' " Maravilla subsequently texted defendant, " 'Hell yea homie that airsoft desert eagle is fucking sick! !' " According to Buelow, an Airsoft is a toy gun and a Desert Eagle is a real gun.

4

After exchanging additional messages, defendant texted Maravilla, " 'I will show you that its real I will hit you up tomaro.' "  To this, Maravilla responded, " 'No nigga. I'm using code.' "  On March 11, defendant texted Maravilla, " 'Yeah.  Bullseye on the targets.' "

On March 12, defendant and Maravilla had an exchange of messages which, according to Buelow, was about "what their intents are with the gun."  Maravilla sent a message to defendant stating, " 'some fools really actin hard though.' "  Defendant responded, " 'Foreal?  Damn.  I'm down.  Oh, yeah, they gonna turn soft when I pull this shit out.' "  Buelow testified that defendant was saying that he was going to pull the gun out, and the people he pulled the gun on would "cower or be afraid."  Additionally, on the night of March 12, Maravilla sent a message to Layton asking, " 'Is it kool of me and [defendant] to slide.' "  Maravilla also stated, " 'We gone show you something ahahh.' "  According to Buelow, Maravilla was asking if he and defendant could come over and show him a gun.

On March 13, Melody Miller, who also testified under a grant of use immunity, agreed to drive Chavez to a location in Roseville where he intended to sell the marijuana.  Miller's friend Brianna was also in the car.  They stopped near a park where Chavez was supposed to meet someone, but the person called and directed Chavez to go to the end of the street.  They drove the car to the end of a cul-de-sac, parked, and began to smoke marijuana.  A light skinned Hispanic male wearing a red Northern Cali hoodie or sweater and a red hat, whom Chavez identified at trial as Layton, walked up to the car and Chavez got out.  Chavez and Layton spoke briefly, Chavez pulled out a bag of marijuana, and then Layton pulled a revolver.  Layton said to Chavez, "Give me your stuff."  Chavez gave or tossed the marijuana to Layton, backed up, and then ran.  Layton then pointed the gun at Miller and Brianna and asked them, " 'What do you have?' "  He took the marijuana cigarette from Miller and ran away.

At approximately 6:30 p.m., Detective James Haggerty (then a patrol officer) responded to a call of an armed robbery and met with Chavez, Miller, and Brianna. Chavez initially indicated that he was 80 percent sure he could identify the robber. He stated that the robber wore clothes that were all red and black. Haggerty logged in to Facebook, went to Chavez's account, and they looked at the Facebook profile of a potential suspect. Chavez pointed to someone in a photograph who had a tattoo on his left forearm. The potential suspect was Maravilla.

In messages Maravilla exchanged on the afternoon of March 13, he stated that he was in Oakmont, which was in the vicinity of the robbery. In a message sent at 7:54, after the robbery, Layton, who lived approximately one block from the location of the robbery, said to Maravilla, " 'Bro cops aree here.' " At the time, police were canvassing the neighborhood.

Sergeant Andrew Palmore went to where Maravilla lived with his mother. That location was within a mile, perhaps even five blocks, of the location of the robbery. The name Fredo came up in the conversation with Maravilla's mother, and, after performing more research of Maravilla's Facebook account, Palmore expanded his focus to include defendant.

Palmore interviewed Maravilla on March 23, 2014. Maravilla said that he was aware that a drug deal had been arranged with Chavez, that the transaction was actually going to be a robbery, and that he knew there would be a gun involved. They discussed the firearm used in the robbery. Maravilla mentioned that someone named Sam T. was involved.

After taking another statement from Chavez, Palmore began to focus on Layton. In a search of Layton's house on March 25, 2014, Palmore found that Layton's clothing and shoes were predominantly red. There was a lack of other-color clothing, and, specifically, there was a lack of blue clothing. In Layton's bedroom, Palmore also found a California Republic flag with a red star on the top. He found a backpack with the

6

words "Nor Cal" on it separated by a red star. Palmore also described a tattoo on Layton's right arm. The tattoo was of the state of California with a red star in the northern part of the state. Officer Michael Sidebottom, who testified as an expert in gangs, testified that this tattoo was consistent with a gang tattoo. Palmore described another tattoo, from Layton's biceps to his wrist, which, in a form of calligraphy, said, "Layton."

In a conversation with Palmore, Layton acknowledged that he confirmed the drug deal with Chavez, suggesting that the "Tyler" with whom Chavez communicated was Layton. Layton stated that a backpack that had been brought to his house contained a gun. Layton said the gun was going to be used to "hit a lick," or commit a robbery and that marijuana was to be stolen in the robbery.

Chavez viewed three separate photo lineups. Chavez identified Layton in one of the photo lineups, and indicated that he was 100 percent certain. Chavez did not pick out Maravilla in the photo lineup in which his photograph appeared.

Within a month after the robbery, Palmore learned from Maravilla that Nick Jones might have the gun used in the robbery. Eventually, Jones turned the gun in to police.

Sam T., also testifying under a grant of immunity, was 14 years old when he met defendant. He moved from Rhode Island to California in May 2013. He did not have any friends, defendant seemed to be a good guy, and defendant and Sam T. became friends. They would hang out together, play basketball, and "screw around." They would also occasionally smoke marijuana. Sam T. told Palmore that defendant was like a big brother to him. He testified that he looked up to defendant, and that defendant had his back. Prior to moving to California, Sam T. had not been involved in any gangs and he had no knowledge of gangs.

At some point, defendant told Sam T. that defendant's life was in danger because of gang problems, specifically Southerners, and he needed a gun to protect himself.

Sam T. took his father's gun and gave it to defendant, thinking he "was doing the right thing by [his] friend."

On April 4, 2014, Palmore met with Sam T. in the principal's office of Sam T.'s middle school. Sam T. was wearing a red hat, a white shirt, all red pants, and a red watch. "[H]e was red from head to toe." Sam T. told Palmore that he was dressed the way he was for defendant. Palmore spoke with Sam T. about his father's gun, a revolver, which Sam T. identified at trial.

Palmore reviewed photographs on Sam T.'s cell phone. Among the photographs on the phone there was a photo of two people sitting on a stairway, both of whom were wearing beanies and red shirts, which said, " 'Young Gunna' " in red at the bottom; a photo of two people rolling blunts, one of whom was wearing a red hat and red shoes; a photo of an album cover that said, " 'Snitches ain't . . .' "; a photo of someone sitting in the passenger side of a black car with red accents, wearing red shoes, a red shirt, a red hat, and black pants, holding a red shoe with a pile of red shoes nearby; and a photo of a drawing of a male wearing a blue hat with the number 13 on it (the number with which Sureños identify), with dark blue or black pants and blue shoes with a gun and muzzle flash on one side of his head, a bullet going through his head, and blood splattering out the other side of his head. That picture said, " 'You wanna trip, let the true color drip,' the true color being red. And then above that, it says, 'F-u-c-k Scraps, XIV.' " Sidebottom testified of this picture, "when we see blood, it's red. Red is the true color for the Norteño criminal street gang. So it's basically a disrespectful image to the Sureños by the Norteño criminal street gang." There was also a photo of a person with a red beanie and a red San Francisco 49ers jacket holding what appeared to be a pistol grip standing against a wall under a banner that said, " 'Stocktone.' "

Another picture was a screenshot of a Google search for the term " 'Norteño tattoos,' " and "in red writing on the top, it says, F-u-c-k-a. It's -- it means it's a Skrapa, S-k-r-a-p-a, but out of disrespect for the S, they have crossed out or squiggled out the S,

so it just says 'krapa.' And then below in red, there's an 'X' in one corner, a '4' in one corner, and between them it says, 'And a para,' and then in between those two quotes, there's a -- on the left, it says 'Sur 13,' S-u-r 13 in blue with a red X over it, and then next to that, there's a -- the mascot for the Fresno Bulldogs, I believe, with a red X over that." There was also a photograph on Sam T.'s phone of defendant with a gun.

Sam T. testified that he had the pictures just because he thought they were cool. He acknowledged that it "could have been" after he befriended defendant that he put the images on his phone.

Police took additional drawings from Sam T.'s room. One was of the roman numerals XIV, which Sam T. knew to be a symbol of the Norteño gang. On another page, he wrote, "Nortés," referring to the Norteño gang. Sidebottom described symbols and words from other drawings from Sam T.'s room, including " 'XIV,' " " 'Family first,' " " 'Norté, XIV,' " and " 'Bay Area Locos.' " Sidebottom testified that these were consistent with the Norteño criminal street gang. Another drawing contained the words, " 'Northern Family,' " and " 'XIV, Scrap, Death, Norté For Life.' " Another contained the word " 'Family.' " Sidebottom testified that, while the reference to family could seem innocuous, "Nuestra Familia means 'Our Family.' So the N.F. or allegiance to the N.F., it's Nuestra Familia, our family."

Sam T. acknowledged that all of the drawings were about the Norteño gang. Sam T. testified that he just "thought it was kind of cool."

In addition to the photographs and drawings, Palmore noted the large amount of red clothing Sam T. had, which he believed to be gang clothing. Sam T. testified that he gravitated towards red was just because he liked red.

A number of messages between Sam T. and defendant had been deleted from Sam T.'s phone, which Sam T. acknowledged.

Sam T. testified that he was never part of any gang. Asked if he ever did gang activities with defendant, Sam T. testified, "No. He distanced me from that kind of

stuff." Sam T. acknowledged that he had gotten a tattoo that said "Family" on his arm, similar to defendant's tattoo, although Sam T. testified that his tattoos were not influenced by defendant.

Asked if he thought Sam T. considered defendant to be like a big brother, Palmore testified that, in his opinion, Sam T. "idolized [defendant], looked up to him and wanted to emulate him. So I kind of felt like that was a factor in their relationship. But . . . this type of relationship is a little more complex than me being buddies with somebody."

Palmore got permission from Sam T.'s parents to use Sam T.'s cell phone. Posing as Sam T., Palmore sent a message to defendant, asking " 'Who got a 20?' " meaning $20 worth of drugs. Palmore received a response stating, " 'My homie. It's fire g. No lie,' " meaning that a friend has the drugs and they are really good. Palmore received additional messages that said, " 'Some kush,' " referring to high-end marijuana. Palmore asked " 'How much fo half zip,' " meaning how much for half an ounce. He then sent another message stating, " 'Parents just gave me two bills,' meaning $200." Palmore received a response stating, " 'Nice lol yeah. He said 70, but he driving to you whenever you want I just talk to him.' "

A white Jeep entered the parking lot where Palmore, posing as Sam T., had arranged to meet defendant. Defendant was in the car along with Cody Ranum. Officers stopped the Jeep and detained the occupants. Defendant was wearing a red and black San Francisco 49ers hat which was embroidered with the word Stockton and the number 209, Stockton's area code. Sidebottom testified that a lot of gang members identify themselves using an area code. He also testified that a lot of Northerners wear San Francisco 49ers clothing, which is red and gold, and further testified that the SF on that apparel can be deemed by Northerners to stand for "Scrap-Free," "Scrap" being a derogatory term used by Norteños for Sureños. In the car there were also red and black shoes and a red cloth belt with a metal buckle of a type commonly worn by Norteño gang

10

members.  Police also found defendant's cell phone, a digital scale, and multiple containers with marijuana.

At the time of defendant's apprehension, Sam T. was sending messages to defendant's phone warning defendant that the police had control of Sam T.'s phone. Sam T. also told defendant, " 'Yo dawg.  Banger case caught up to me,' " meaning he was in trouble because of the gun.

After arresting defendant, Palmore searched defendant's room.  He found several drawings.  One was of a hand making a "W" sign and was signed by defendant. Sidebottom testified that some West Roseville Norteños throw the W sign to represent their gang.  Another was of an "old-school gangster" wearing a zoot suit, holding a tommy gun, and smoking something, which said, " 'Nor Cal' " and " 'Mob Mafia.' "  A third was of a hand making a " 'W' " gesture, dice showing the numbers 1 and 4, happy and sad clown masks, a diamond, a star, the words " 'Street Made' " on a banner, a face with two teardrops, and a cross.  This drawing was also signed by defendant.  Sidebottom testified that the 1 and 4 were significant because it was the number identifier for Norteños, and that the Northern Star was a symbol of Nuestra Familia.  A fourth drawing showed a scroll banner that said, " 'Nor Cal,' " with two three-dimensional stars behind it.  In addition to the significance of the stars, "Nor Cal" can refer to Northern California "[a]s a Northerner."

Palmore also viewed defendant's Facebook profile.  In one photograph, defendant was making a " 'W' " with his hand and was wearing a red necklace and a red and black hat.  One comment on that post, from a Jarod Stockman, a known Norteño, said, " 'Is this West Side 4 fingers?' "  Defendant replied, " 'Yee, Buddy.' "  Sidebottom testified of the "West Side 4 fingers" that "It's common people throw out the '1' and the '4,' four fingers."  Asked if it was common to see Roseville area Norteños throw out four fingers in allegiance to the gang, Sidebottom responded, "[i]n pictures, yeah, you'll see the '1'

11

and '4.' " In another post, defendant stated, " 'Got caught up, Mayyne,' . . . 'Please pray for me y'all. Real shit.' "

Defendant was friends on Facebook with Matthew Mejia, his uncle. In a post shared between the two, defendant said, " 'First offer was hella years. WTF,' " and " 'Fuck you'all. No way I'm taking that.' And then, capital T capital F, which means, 'The fuck,' or 'What the fuck.' " Mejia, who lived in Oklahoma, responded, " 'Hell naw,' " and " 'You not gonna do dat. If anythin, you will come live with me. Fuck them.' "

Defendant made various statements to Palmore. In two separate statements, defendant indicated he knew Sam T. was 14 years old.

Palmore asked defendant about the robbery and showed defendant a photograph of the gun he recovered from Jones. Palmore asked defendant if he had ever seen the gun before. After going back and forth about the gun in relation to the robbery, defendant ultimately admitted, " 'I brought it. I brought it.' " Another detective asked, " 'You did bring it,' " and defendant responded, " 'I'm sorry, man. You guys wanted me to crack. I cracked.' "

Officer Sidebottom testified that there are more than 1,000 Norteño members in the greater Sacramento area and hundreds in Placer County. Signs and symbols associated with the Norteño gang included the number 14, the color red, and the roman numbers XIV. Additionally, a red Northern Star is a sign of Nuestra Familia or Nuestra Raza/Northern Structure, tiers of the affiliated prison gang for which the Norteño street gang serves as street soldiers. Also, sports-related clothing can serve as symbolic of the gang depending on its color and the letters appearing on it.

Typical crimes committed by Norteños in the area included drug sales, witness intimidation, robberies, assaults, and shootings.

Sureños are rivals to the Norteños, as are the Fresno Bulldogs. The Sureño gang identified with the color blue and the number 13.

12

Sidebottom opined that the Norteños were a criminal street gang within the meaning of section 186.22. He also testified that, while there are various cliques or subsets of the Norteño gang, someone "can be a Norteño." He testified that the Norteño gang consisted of three or more people, had common signs and symbols, and had a pattern of criminal activity.

Sidebottom testified that, in the Roseville area, typically, gangs would recruit younger kids as members from the Roseville Heights and Thieles neighborhoods. The gangs typically target "homes with family issues, kids that are -- are looking to identify with something, that are looking for safety, self-esteem, belonging, they tend to gravitate and start hanging out with other gang members to get those things, to get the safety, to get the belonging, and then just kind of goes from there."

Sidebottom testified that a drug rip would benefit the Norteños in "[a] lot of ways." It would benefit the Norteños financially. It would also enhance the gang's reputation. "It puts the name out there. It -- gangs typically rule by fear and intimidation. And when they're -- you know, that's the reason why people don't call 911 sometimes because they're afraid. You know, people don't want undercover cops interviewing someone in front of their house because they are afraid the gang is going to retaliate." He continued, "Fear and intimidation are one of their powers to be able to commit crimes. So the -- that whole idea gives them more power. [¶] And then you have, like I said, the monetary reasons, the reputation within the community, and then just even the reputation amongst each other."

Officer Sidebottom concluded that defendant was a member of the Norteño criminal street gang, and that he associated with the West Roseville Norteños. He concluded that Maravilla was an associate of the Norteño gang. He concluded that Layton became involved in the Norteño gang at the moment of the robbery.

Sidebottom also believed that defendant was recruiting Sam T. to be in the Norteño gang. He elaborated: "one is Sam T., a 14-year-old kid, new to the area, admits

13

he doesn't have any friends, came from Rhode Island, and in a short period of time, obviously in the drawings and other things, is learning about Norté, XIV. And then in his statement to . . . Sergeant Palmore, he is saying that he does that to respect [defendant]." Asked how the recruiting process works, Sidebottom testified: "it could be, like I said, as -- for Norteños, there's a lot of things you can do, but typically someone is mentoring you. Someone is kind of teaching you a little bit, kind of being your big brother, your buddy, or, you know, your friend in a sense, teaching you and preparing you, and then it goes from there." He subsequently described his understanding of recruiting: "taking that person under your wing, educating them, having their back, just being . . . the mentor, big-brother-type, getting them knowledged-up."

On cross-examination, Sidebottom was asked why he would characterize the circumstances surrounding Sam T. as involving someone being recruited to be a Norteño rather than someone who already was a Norteño. Sidebottom responded: "Not by the way he is dressed. It would be more of the conversations that he had with detectives. It would be the actions that he did to take his father's gun. It would be the total combining of things, the drawings. All of that stuff together would lead me to believe that he is moving in that direction." He subsequently continued, "it would be the totality of everything. Looking for that friendship, that affirmation, so to say, safety, friendship, telling the detectives that he's wearing that stuff to respect [defendant], that he's not -- I mean, he's doing drawings, and I believe he said he was doing the drawings out of respect as well. In a very short period of time, he was getting involved in all [of] these activities."

Regarding predicate offenses, on November 29, 2013, officers responded to a call about a fight at an apartment complex. Eventually, police located and stopped the vehicle. There were six occupants. Most of them were wearing red. Police investigated the incident as gang-related. Defendant, Juan Soto, Cody Ranum, Carissa Collins-Fairweather, Rudy Garcia, and Augie Garcia were arrested. Officer Michael Ryland,

14

who testified as a gang expert, testified that the participants committed the offense at the direction of, in association with, or to benefit the Norteño criminal street gang. Sidebottom testified that he believed this incident was undertaken in association with the West Roseville Norteños.

Soto and Ranum were both convicted of a gang offense under section 186.22. Rudy Garcia and Carissa Collins-Fairweather were convicted of a crime with a gang enhancement. Defendant and Soto were convicted of attempted criminal threats.

Dylan S. testified that, on March 20, 2013, he arranged to buy marijuana. When he went to meet the seller, some people in a vehicle almost jumped him so he ran inside the house. Dylan S. and the people he was living with then went outside and around the corner, saw the people in the vehicle, and the people in the vehicle started shooting at them. Dylan Darling, a member of the West Roseville Norteños, was involved in the incident. Another participant, Jorge Torres, had a large "N" tattooed on his neck and had one dot and four dots on his hands consistent with the number 14. He also had "530" tattooed on his hand, which is the area code for North Lake Tahoe. Torres was from Kings Beach. Another suspect, Israel Tenorio, was also from Kings Beach. During his investigation, Detective Ken Nakamura determined that Darling and another suspect, Andrew Salazar, were living with Maravilla in Roseville. Torres, Tenorio, Salazar, and Darling were all in the vehicle involved in the attack on Dylan S.

In a search of Maravilla's room police found red clothing and hats. One hat had a "W" on it, and Nakamura testified that the West Roseville Norteños sometimes wear such hats with the W standing for West. Nakamura stated that the crimes occurred within the territory of the West Roseville Norteños. He concluded that the incident was "possibly gang-related," and that assault crimes are a type of crime typically committed by the Norteño criminal street gang. Sidebottom concluded that the crime was gang related.

15

Brian Sheaffer, defendant's stepfather, testified that he thought he may have influenced defendant's decision to get a tattoo of the word "Family" on his forearm. Sheaffer had a tattoo of defendant's mother's name on his forearm in the same location and in the same style of writing. Brianna Martinez, defendant's younger sister, testified that defendant loves the San Francisco 49ers. She had never heard of the Norteños.

Douglass Fort testified as a gang expert. Fort offered two different definitions of "Norteño." He testified that a Norteño can be simply a Latinx individual from the northern part of California, or a Norteño gang member, "usually . . . connected to a subset that's been approved from the N.F., Nuestra Familia." Fort stated that a person cannot be a Norteño without being a member of a particular subset. Fort testified that, in his opinion, Layton was not a Norteño gang member. Fort did not believe that the evidence was sufficient for him to opine as to whether Maravilla was a Norteño gang member. As for defendant, Fort testified: "I haven't read any evidence that shows that he is a part of any subset of the N.F." He also testified that "[z]ero . . . [n]one" of what he reviewed made him reach the opinion that defendant was part of the West Roseville Norteños. Fort did not believe that the robbery of Chavez was committed for the benefit of, at the direction of, or in association with a criminal street gang "because there's no subset."

The jury found defendant guilty of count two, robbery in the second degree. The jury left blank the part of the verdict form addressed to the section 186.22, subdivision (b)(1), gang enhancement allegation attached to count two as well as the allegation that a principal was armed with a firearm during the commission of count two within the meaning of section 12022, subdivision (a). The jury found true the allegations that defendant furnished a firearm in connection with count two within the meaning of section 12022.4. The jury also found true the allegation in connection with count two that a principal used a firearm within the meaning of section 12022.53, subdivision (e). The

jury found defendant guilty on count four, active participation in a criminal street gang, and found true the allegations that, in the commission of count four, a principal was armed with a firearm and that defendant furnished the firearm. The jury found defendant guilty on count five, criminal conspiracy. The jury further found true the allegations that, in the commission of count five, a principal was armed with a firearm and that defendant furnished the firearm. However, the jury left blank the space for its finding on the allegation that defendant committed count five for the benefit of, at the direction of, or in association with a criminal street gang. The jury found defendant guilty on count seven, being an active participant in a criminal street gang having a concealed firearm, and count eight, recruiting a minor into a criminal street gang.

The jury found defendant not guilty on count three. The jury was not able to reach a verdict on counts one and six and did not make findings as to the attached special allegations, and the trial court declared a mistrial as to those counts.

As addressed in part II of the Discussion, *post*, the jury did not arrive at a true finding, or any finding, on the section 12022, subdivision (a), enhancement allegation attached to count two. Thus, the trial court erroneously imposed and stayed sentence on this enhancement.

The trial court sentenced defendant to an aggregate term of 16 years, eight months, calculated as follows: the midterm of three years on count two, second degree robbery, plus 10 years for the section 12022.53, subdivision (e), firearm enhancement attached to count two, one year stayed pursuant to section 654 on the section 12022, subdivision (a), enhancement attached to count two, and two years stayed pursuant to section 654 for the section 12022.4 enhancement attached to count two, two years concurrent on count four, active participation in a street gang, plus one year stayed pursuant to section 654 for the section 12022, subdivision (a), enhancement and two years stayed pursuant to section 654 on the section 12022.4 enhancement attached to count four, the midterm of three years on count five, stayed pursuant to section 654, plus one year stayed pursuant to section 654

17

for the section 12022, subdivision (a), enhancement attached to count five and two years stayed pursuant to section 654 on the section 12022.4 enhancement attached to count five, two years concurrent on count seven, active participant in a criminal street gang having a concealed firearm, one-third the midterm, eight months, on count eight, recruiting participation in criminal street gang (§ 186.26, subd. (a)), plus one year, or one-third the midterm, because the person recruited was a minor (§ 186.26, subd. (d)), and two years for the section 12022.1 on-bail enhancement.

Further, the abstract of judgment does not reflect the number of years imposed and stayed on count five. Because we are ordering an amended abstract of judgment upon remand, the amended abstract should reflect the three-year term imposed and stayed on count five.

DISCUSSION

I

*Impermissibly Inconsistent Verdicts*

The trial court instructed the jury with CALCRIM No. 1402. The court instructed the jury, in relevant part: "If you find a defendant guilty of the crimes charged in Counts 2 or 3, *and you find that defendant committed those crimes for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in any criminal conduct by gang members*, you must then decide whether, for each crime, the People have proved the additional allegation that one of the principals personally used a firearm during that crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime." (CALCRIM No. 1402, italics added.)

The jury found defendant guilty of count two, robbery in the second degree. The jury left blank the part of the verdict form addressed to the section 186.22, subdivision (b)(1), gang enhancement allegation attached to count two. The jury found true the

18

allegation in connection with count two that a principal used a firearm within the meaning of section 12022.53, subdivision (e). In light of the jury's inability to reach a determination on the gang enhancement allegation, the trial court dismissed that allegation.

In his sentencing memorandum, defendant asserted that a prerequisite to a true finding on a section 12022.53, subdivision (e), enhancement is that the prosecution pled and proved the defendant violated section 186.22, subdivision (b). Defendant asserted that the jury's failure to make a finding on the gang enhancement allegation on count two was inconsistent with its true finding on the section 12022.53, subdivision (e), enhancement allegation. Therefore, defendant asserted that the section 12022.53, subdivision (e), enhancement "cannot stand."

In a written ruling, the trial court denied defendant's request not to impose sentence on the section 12022.53, subdivision (e), enhancement. The court concluded that sufficient evidence supported a true finding on the gang enhancement allegation. The court further stated that the "fact that the jury could not agree on that allegation does not necessarily mean that the allegation was not proved for purposes of a true finding" on the section 12022.53, subdivision (e), enhancement allegation. The court further relied on the italicized language of CALCRIM No. 1402, *ante*.

Defendant asserts that the section 12022.53 firearm enhancement on count two must be struck because it is impermissibly inconsistent with the jury's verdict. He asserts that there must have been a true finding on the section 186.22, subdivision (b)(1), gang enhancement allegation before there could be a true finding on the firearm enhancement under the vicarious liability provision of subdivision (e) of section 12022.53. However, here, the jury failed to find the gang enhancement allegation to be true. Defendant also emphasizes that the jury was specifically instructed that, to reach the firearm enhancement, it first had to find the gang enhancement true.

19

Section 12022.53, subdivision (e), provides, in part: "(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)." Subdivision (b) of section 12022.53, applicable to the circumstances of this case, provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."

Section 186.22, subdivision (b)(1), provides, with exceptions not relevant here, "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as" set forth in that subdivision.

"As a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] For example, 'if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both.' [Citation.] Although ' "error," in the sense that the jury has not followed the court's instructions, most certainly has occurred' in such situations, 'it is unclear whose ox has been gored.' [Citation.] It is possible that the jury arrived at an inconsistent conclusion through 'mistake, compromise, or lenity.' [Citation.] Thus, if a defendant is given the benefit of an acquittal on the count on which he was acquitted, 'it is neither irrational nor illogical' to require him to accept the burden of conviction on the count on which the jury

20

convicted." (*People v. Avila* (2006) 38 Cal.4th 491, 600.) Thus, even if the jury's determinations were inconsistent, as a general matter, this would not provide defendant with grounds for reversal.

Defendant argues there is an exception to this general rule applicable when " 'all of the essential elements of the crime of which the defendant was acquitted are identical to some or all of the essential elements of the crime of which he was convicted, and proof of the crime of which the defendant was acquitted is necessary to sustain a conviction of the crime of which the defendant was found guilty.' " (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1659 (*Pahl*), quoting *People v. Hamilton* (1978) 80 Cal.App.3d 124, 130.) However, the court in *Pahl* made clear that this exception, which it denominated the "conspiracy exception" (*Pahl, supra*, 226 Cal.App.3d at p. 1657), applies *only* in conspiracy cases and refused to extend the rule to nonconspiracy cases (*id*. at pp. 1657-1660).

Defendant maintains the *Pahl*'s determination arose in a case that is distinguishable and not controlling here. He asserts that the reasoning in *Johnston* is not limited to its particular facts. We disagree. As the *Pahl* court stated: "The fact that we . . . and other Courts of Appeal have stated the narrow conspiracy exception in broad language as if it might properly be applied in nonconspiracy cases does not render that a correct statement of the law; it is not. The Legislature has decreed that an acquittal of one count shall not be deemed an acquittal on another count. The Supreme Court [in *In re Johnston* (1935) 3 Cal.2d 32 (*Johnston*)] fashioned a very limited exception to that rule which applies only in cases where there is a conspiracy count. There is no conspiracy count here. Therefore, we reject appellant's contention." (*Pahl*, at p. 1660; see § 954 ["[a]n acquittal of one or more counts shall not be deemed an acquittal of any other count"].)

The same is true here. Neither of the challenged findings, or lack thereof, relate to charges or allegations of conspiracy. Therefore, the conspiracy exception, to the extent it

remains viable (see *People v. Palmer* (2001) 24 Cal.4th 856, 860-865), does not apply (*Pahl, supra*, 226 Cal.App.3d at pp. 1657-1660).

The Attorney General undertakes a substantial evidentiary analysis to support the contention that sufficient evidence supported the jury's necessary determination in connection with the section 12022.53, subdivision (e), true finding that defendant "violated subdivision (b) of Section 186.22." (§ 12022.53, subd. (e)(1)(A).) Defendant, in discussing the general rule concerning inconsistent verdicts, notes that "a verdict of conviction on one count which appears inconsistent with a verdict of acquittal on another count affords no basis for a reversal *where the evidence is sufficient to support the conclusion that the defendant is guilty of the offense of which he stands convicted*." (*People v. Davis* (1988) 202 Cal.App.3d 1009, 1016, citing *Johnston, supra*, 3 Cal.2d at p. 36, italics added.) However, defendant does not contend that substantial evidence did not support a factual determination that defendant violated section 186.22, subdivision (b). Rather, defendant asserts that the true finding was an impermissibly inconsistent verdict, a contention we have rejected.

Defendant in his reply brief further asserts that the jury did not make the necessary factual determination that defendant violated section 186.22, subdivision (b), based on the jury's failure to make a finding on the substantive section 186.22 enhancement allegation. However, we agree with the trial court's determination that the jury could conclude that violation of section 186.22, subdivision (b), had been "pled and proved" within the meaning of section 12022.53, subdivision (e), notwithstanding the failure to reach a finding on a related section 186.22 enhancement allegation. (Cf. *People v. Garcia* (2002) 28 Cal.4th 1166, 1172-1175 ["to find an aider and abettor--who is not the shooter--liable under section 12022.53, subdivision (d), the prosecution must plead and prove that (1) a principal committed an offense enumerated in section 12022.53, subdivision (a), section 246, or section 12034, subdivision (c) or (d); (2) a principal intentionally and personally discharged a firearm and proximately caused great bodily

22

injury or death to any person other than an accomplice during the commission of the offense; (3) the aider and abettor was a principal in the offense; and (4) the offense was committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' [Citations.] Although the aider and abettor must first be convicted of the underlying offense before the enhancement may apply [citation], the prosecution need not plead and prove the *conviction* of the offense by the principal who intentionally and personally discharged a firearm"].)

That the jury did not find that defendant violated section 186.22, subdivision (b) is not established on this record. We note in this regard that CALCRIM No. 1402 specifically instructed the jurors that, if they found defendant guilty on count two, they had to first "find that defendant committed [that] crime[] for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in any criminal conduct by gang members" before making their ultimate determination on the firearm enhancement allegation. "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Because defendant has not advanced an argument addressed to the sufficiency of the evidence, we do not conduct our own substantial evidence analysis. Were we to do so, we would conclude that substantial evidence supports the jury's determination and the true finding on the section 12022.53, subdivision (e), enhancement allegation. Moreover, we note, as did the trial court, that, notwithstanding the arguably inconsistent verdicts addressed here, the jury found defendant guilty of substantive gang offenses on counts four, seven, and eight.

Accordingly, we reject defendant's contention that the section 12022.53, subdivision (e), enhancement must be struck because it is impermissibly inconsistent with the jury's verdict.

23

## II

### *The Section 12022, Subdivision (a), Enhancement*

Defendant asserts that the jury did not make a true finding on the section 12022, subdivision (a), enhancement attached to count two. Because the jury did not find this particular firearm enhancement allegation to be true, the sentence imposed must be vacated and the minute order and abstract of judgment corrected. The Attorney General concedes that there was no true finding on this firearm enhancement allegation, and we agree.

The verdict form relative to the section 12022, subdivision (a), firearm enhancement attached to count two was left blank. The trial court found the jury deadlocked on the allegation and declared a mistrial on it. Nevertheless, at sentencing, the court recited that this section 12022, subdivision (a), enhancement was found true, and it imposed a one-year sentence, stayed pursuant to section 654. This was error. We shall modify the oral pronouncement of judgment to reflect that the section 12022, subdivision (a), enhancement attached to count two was found not true, and we shall further order the sentencing minute order and abstract of judgment corrected to reflect this and to strike the sentence imposed.

## III

### *Count Eight Was Supported by Substantial Evidence*

Defendant asserts that the guilty verdict on count eight must be reversed because the evidence was legally insufficient to prove he solicited or recruited Sam T. to actively participate in a criminal street gang. Defendant acknowledges the evidence established that he was friendly with Sam T., that they spent time together, that Sam T. did not have other friends, and that Sam T. respected defendant. However, defendant asserts that there was no evidence he solicited or recruited Sam T. to actively participate in either the Norteño gang or the West Roseville Norteños subset.

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

Section 186.26 provides, in pertinent part, "(a) Any person who solicits or recruits another to actively participate in a criminal street gang, as defined in subdivision (f) of Section 186.22, with the intent that the person solicited or recruited participate in a pattern of criminal street gang activity, as defined in subdivision (e) of Section 186.22, or with the intent that the person solicited or recruited promote, further, or assist in any felonious conduct by members of the criminal street gang, shall be punished by imprisonment in the state prison for 16 months, or two or three years. [¶] . . . [¶] (d) If the person solicited, recruited, coerced, or threatened pursuant to subdivision (a), (b), or (c) is a minor, an additional term of three years shall be imposed in addition and consecutive to the penalty prescribed for a violation of any of these subdivisions."

25

" 'Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. [Citation.] We must look to the statute's words and give them their usual and ordinary meaning. [Citation.] The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' . . . If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy." (*People v. Arias* (2008) 45 Cal.4th 169, 177.)

" 'Solicitation is defined as an offer or invitation to another to commit a crime, with the intent that the crime be committed. The crime of solicitation . . . is complete once the verbal request is made with the requisite criminal intent; the harm is in asking, and it is punishable irrespective of the reaction of the person solicited.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 328.) The Merriam-Webster Online Dictionary defines the transitive verb "solicit" as "to make petition to," "to approach with a request or plea," "to urge (something, such as one's cause) strongly," "to entice or lure especially into evil," "to proposition (someone) especially as or in the character of a prostitute," and "to try to obtain by usually urgent requests or pleas." (Merriam-Webster Online Dict. <https://perma.cc/J839-D35S> [as of September 23, 2020].) Thus, to solicit someone to actively participate in a criminal street gang would mean, among other things, to make petition to, request or plea, urge strongly, or entice or lure the object to actively participate in the gang.

The Merriam-Webster Online Dictionary defines the transitive verb "recruit" as "to fill up the number of with new members," "to enlist as a member of an armed service," "to increase or maintain the number of," "to secure the services of," "to seek to enroll," to replenish, and "to restore or increase the health, vigor, or intensity of." (Merriam-Webster Online Dict. <https://perma.cc/369Y-K295> [as of September 22, 2020].) Thus, to recruit a target to actively participate in a criminal street gang would mean, among other things, to fill up the gang with new members including that target, to

26

increase or maintain the number of the gang, to secure the services of the target for the gang, and to seek to enroll the target in the gang.

Here, Sam T. was 14 years old when he met defendant. Sam T. moved from Rhode Island to California and he did not have any friends. Sam T. and defendant would hang out together, play basketball, and "screw around." They would also occasionally smoke marijuana. Sam T. told Palmore that defendant was like a big brother to him. He testified that he looked up to defendant, and that defendant had his back.

When Palmore met with Sam T. in the principal's office of Sam T.'s middle school, Sam T. was wearing a red hat, a white shirt, all red pants, and a red watch. "[H]e was red from head to toe." Sam T. told Palmore that he was dressed the way he was for defendant.

Palmore reviewed photographs on Sam T.'s cell phone. These images are described in detail, *ante*, and we need not reproduce that discussion here. It is sufficient to say that these photographs were replete with imagery, text, and symbols of the Norteño gang and insulting to the rivals of the Norteños. There was also a photograph on Sam T.'s phone of defendant with a gun.

Prior to moving to California, Sam T. had not been involved in any gangs and he had no knowledge of gangs. Sam T. testified that he had the pictures just because he thought they were cool. He acknowledged that it "could have been" after he befriended defendant that he put the images on his phone.

Police took drawings Sam T. made from his room. Again, we need not repeat our description of these items here. Sidebottom testified that the drawings were consistent with the Norteño criminal street gang. In fact, Sam T. acknowledged that all of the drawings were about the Norteño gang. Sam T. testified that he just "thought it was kind of cool."

27

In addition to the photographs and drawings, Palmore noted the large amount of red clothing Sam T. had, which he believed to be gang clothing. Sam T. testified that he gravitated towards red was just because he liked red.

A number of messages between Sam T. and defendant had been deleted from Sam T.'s phone, which Sam T. acknowledged.

Asked if he ever did gang activities with defendant, Sam T. testified, "No. He distanced me from that kind of stuff." However, this denial suggests, at the very least, Sam T.'s awareness of the nature of defendant's activities.

Asked if he thought Sam T. considered defendant to be like a big brother, Palmore testified that, in his opinion, Sam T. "idolized [defendant], looked up to him and wanted to emulate him. So I kind of felt like that was a factor in their relationship. But . . . this type of relationship is a little more complex than me being buddies with somebody."

Finally, Sam T. procured his father's gun for defendant. Sam T. testified that he did so because defendant's life was in danger because of gang problems, specifically Southerners, and he needed a gun to protect himself. At the least, this means Sam T. armed a Norteño gang member against his Sureño rivals. Of course, the jury was entitled to disbelieve Sam T.'s explanation as to why he gave the gun to defendant. As the jury was instructed, the jurors were free to "believe all, part, or none of any witness's testimony." (CALCRIM No. 226.) Thus, the jury could have believed that Sam T. gave defendant the gun for some other reason. The evidence, including the electronic messages, the description of the gun used in the robbery, and Sam T.'s and defendant's admissions indicated that this was the gun used in the robbery.

When defendant was apprehended by officers, Sam T. was actively trying to warn defendant that police had control of Sam T.'s phone. Sam T. also told defendant in a message, " 'Yo dawg. Banger case caught up to me,' " meaning he was in trouble because of the gun.

28

Sidebottom testified that, in the Roseville area, typically, gangs would recruit younger kids as members. The gangs typically target "homes with family issues, kids that are . . . looking to identify with something, that are looking for safety, self-esteem, belonging, they tend to gravitate and start hanging out with other gang members to get those things, to get the safety, to get the belonging, and then just kind of goes from there." Sidebottom believed that defendant was recruiting Sam T. to be in the Norteño gang. He elaborated: "one is Sam T., a 14-year-old kid, new to the area, admits he doesn't have any friends, came from Rhode Island, and in a short period of time, obviously in the drawings and other things, is learning about Norté, XIV. And then in his statement to . . . Sergeant Palmore, he is saying that he does that to respect [defendant]." Asked how the recruiting process works, Sidebottom testified: "it could be, like I said, as -- for Norteños, there's a lot of things you can do, but typically someone is mentoring you. Someone is kind of teaching you a little bit, kind of being your big brother, your buddy, or, you know, your friend in a sense, teaching you and preparing you, and then it goes from there." He subsequently described his understanding of recruiting: "taking that person under your wing, educating them, having their back, just being . . . the mentor, big-brother-type, getting them knowledged-up." Sidebottom subsequently continued, "it would be the totality of everything. Looking for that friendship, that affirmation, so to say, safety, friendship, telling the detectives that he's wearing that stuff to respect [defendant], that he's not -- I mean, he's doing drawings, and I believe he said he was doing the drawings out of respect as well. In a very short period of time, he was getting involved in all [of] these activities."

As stated *ante*, prior to moving to California, Sam T. had not been involved in any gangs and he had no knowledge of gangs. Additionally, there was no evidence that Sam T. spent time with any other Norteño. Yet by the time of the events occurring here, he was dressing like a Norteño, surrounding himself with Norteño imagery, and spending his time with defendant, a Norteño member. Sam T. acknowledged that defendant had an

29

impact on him in terms of his affinity for Norteño imagery. Additionally, Sam T. furnished a gun to defendant, a Norteño, that was used in a robbery. We disagree with defendant's contention that there is no evidence that defendant taught Sam T. " 'what it means to be a gang member.' "

Viewing the record in the light most favorable to the judgment, we conclude that substantial evidence supports the jury's determination that defendant solicited or recruited Sam T., a minor, to actively participate in a criminal street gang within the meaning of section 186.26, subdivision (a). (See generally *Jennings, supra*, 50 Cal.4th at pp. 638-639.) Substantial evidence supports the conclusion that defendant solicited Sam T. by urging strongly that he actively participate in the Norteño criminal street gang or by enticing or luring him into actively participating in the gang. (Merriam-Webster Online Dict. <https://perma.cc/J839-D35S> [as of September 23, 2020].) Substantial evidence also supports the conclusion that defendant recruited Sam T. to actively participate in the Norteño criminal street gang by adding him as a new member and by seeking to enroll him in the gang. (Merriam-Webster Online Dict. < https://perma.cc/369Y-K295> [as of September 22, 2020].) Defendant is correct, of course, that "friendship is not the same as soliciting or recruiting." However, we conclude that substantial evidence, marshalled *ante*, supports the jury's determination that defendant did solicit or recruit Sam T. to actively participate in the Norteño criminal street gang within the meaning of section 186.26, subdivision (a). We cannot say " ' " 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

IV

*Senate Bill No. 620*

Defendant asserts that, following the passage of Senate Bill No. 620 (SB 620), the matter must be remanded to afford the trial court the opportunity to exercise its discretion

30

to strike the section 12022.53, subdivision (e), firearm enhancement. The Attorney General agrees, as do we.

Prior to 2018, the trial court did not have authority to strike the firearm enhancements. On January 1, 2018, SB 620 became effective. (Stats. 2017, ch. 682, §§ 1-2.) That measure vested the court with authority to exercise its discretion to strike firearm enhancements imposed under section 12022.53. (§ 12022.53, subd. (h).) SB 620 applies retroactively to defendant, as it became effective before this case is final. (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.)

Moreover, while remand is not automatic (see *People v. Jones* (2019) 32 Cal.App.5th 267, 272-273; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894), the Attorney General does not assert here that the "record shows that the trial court clearly indicated . . . that it would not in any event have stricken a firearm enhancement." (*McDaniels*, at p. 425.) Nor do we find support for such a proposition in the record.

Accordingly, we shall remand the matter for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (e), firearm enhancement pursuant to sections 12022.53, subdivision (h), and 1385.

## DISPOSITION

The oral pronouncement of judgment is modified to strike the sentence imposed and stayed on the section 12022, subdivision (a), enhancement attached to count two. We remand the matter for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (e), firearm enhancement pursuant to sections 12022.53, subdivision (h), and 1385. Thereafter the trial court shall modify the sentencing minute order to reflect that there was no true finding the section 12022, subdivision (a), enhancement attached to count two and striking the sentence imposed thereon. The court is further directed to prepare an amended abstract of judgment

31

reflecting these changes, the deletion of the section 12022.53, subdivision (e) enhancement should the court exercise its discretion to strike or dismiss it and setting forth the three-year term imposed and stayed on count five, and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.  Otherwise, the judgment is affirmed.

 

                                                _____

                                                HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

MURRAY, J.