Filed 11/5/20  P. v. Mixon CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B297325 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA141142) |
| v. | |
| RONNIE DARNELL MIXON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed as modified.

Jenny M. Brandt, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Stephanie C. Brenan and Nathan Guttman, Deputy Attorney Generals, for Plaintiff and Respondent.

---

## INTRODUCTION

Appellant Ronnie Darnell Mixon was convicted of burgling the home of Delmus Eugene Wilkerson, who was found suffocated to death inside it. An eyewitness to Wilkerson's death, Sherill Waters, testified that appellant suffocated Wilkerson and ransacked his home. She further testified that appellant's former codefendant, Timothy Blaxton, was present during the killing. Blaxton, testifying pursuant to a cooperation agreement with the People, denied being present for the killing but claimed he had seen appellant enter Wilkerson's home shortly before he was found dead. Waters and Blaxton were impeached on various grounds, including but not limited to the fact that Blaxton was testifying in exchange for a lenient plea deal. Without objection, the People introduced evidence that Blaxton's cooperation agreement provided that a neutral judge would review his truthfulness, and the People could revoke his plea deal if he lied.

Appellant was acquitted of murdering and robbing Wilkerson, but convicted of burgling his home. The trial court sentenced appellant to the maximum aggregate term of

2

11 years, including four one-year terms imposed for prior prison terms, and ordered him to pay $870 in various financial obligations.  After he was sentenced, the Legislature enacted Senate Bill No. 136 (S.B. 136), which eliminated one-year enhancements for prior prison terms served for any offenses other than sexually violent felonies.  (Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.)

On appeal, appellant contends:  (1) no substantial evidence supported his burglary conviction; (2) his trial counsel was unconstitutionally ineffective in failing to object to the admission of the cooperation agreement's terms concerning the prospective review of Blaxton's truthfulness; (3) S.B. 136 requires that we strike his one-year enhancements for prior prison terms, and the striking of the enhancements requires that we remand for resentencing; and (4) the trial court violated his due process and Eighth Amendment rights by ordering him to pay $870 without determining his ability to pay; alternatively, his counsel was ineffective in failing to object on the ground of inability to pay.  The People agree only that we must strike the enhancements.

We agree the one-year enhancements for prior prison terms must be stricken.  We find no other error, and no need to remand for resentencing.  Accordingly, we affirm the judgment as modified by the striking of the enhancements.

3

**PROCEEDINGS BELOW**

**A. *Prosecution Case***

The People charged appellant with Wilkerson's murder (Pen. Code, § 187, subd. (a); count one), robbery of Wilkerson (*id.*, § 211; count two), and first degree burglary of Wilkerson's home (*id.*, § 459; count four).[1]  For sentencing purposes, the People alleged that appellant had served eight prior prison terms (*id.*, § 667.5, subd. (b)), and that appellant knew or reasonably should have known Wilkerson was over 65 years old (*id.*, § 667.9, subd. (a)).[2]

**1. *Appellant's DNA***

Wilkerson was found dead in his Compton home (a shed) on August 27, 2016, around 7:00 a.m.  His possessions were in disarray, as if the shed had been ransacked.  A plastic bag was found under Wilkerson's head.  A deputy medical examiner performed an autopsy and opined that the cause of Wilkerson's death was suffocation.  The examiner also found defensive wounds on Wilkerson's left hand, which was bloody.

Appellant's DNA was found on a hair stuck to Wilkerson's bloody hand.  Photographs of the hair and

---

[1]     The People did not proceed to trial on count three, which was similar to count two (robbery).

[2]     The parties stipulated Wilkerson was over 65 years old when he died.

4

Wilkerson's hand were admitted into evidence. Appellant's DNA was not found on the bag found under Wilkerson's head.

### 2. *Waters's Identification of Appellant*

Waters testified that around 4:00 a.m. on the day of Wilkerson's death, she was inside his home, using drugs with him. Wilkerson had previously told her that appellant had robbed him twice. Blaxton knocked on Wilkerson's door and asked to buy drugs. When Wilkerson opened the door to provide the requested drugs, a masked man -- whom Waters later identified as appellant -- rushed inside and pushed Wilkerson to the ground. Appellant straddled Wilkerson's back and wrapped a plastic bag around his head. Blaxton took some drugs from inside Wilkerson's home and left.

While continuing to suffocate Wilkerson, appellant said to Waters, "'Bitch, I kill you, too.'" She begged him not to kill her. Appellant also said, "'I'm doing this to this motherfucker [be]cause my baby is messed up.'" Appellant kept the bag wrapped around Wilkerson's head for seven to 10 minutes. He then stood up, no longer wearing the mask (she did not see him remove it). Waters recognized appellant, whom she had known for more than 20 years.

Appellant started ransacking the shed and asked Waters, "'Bitch, where the gun? Where the money?'" She responded that she did not know, but she found and handed appellant Wilkerson's cell phone. Taking the phone and another small item, appellant left.

Waters exited some distance behind appellant, shaking and crying, and saw his pregnant girlfriend China exit a nearby van. China approached Waters and asked what was wrong. Waters responded that she believed appellant had killed Wilkerson. Waters had seen China inside Wilkerson's home once, and had seen her going to his home frequently. China had used drugs with Waters while pregnant.

Waters acknowledged her memory was "[p]retty bad" and she was not wearing glasses, despite her poor vision, at the time she witnessed the attack. Further, appellant's counsel impeached Waters with inconsistencies between her trial testimony and her earlier statements during police interviews and the preliminary hearing. As the People acknowledge on appeal, "[o]ver the course of Waters's police interviews and testimony, she gave inconsistent accounts of how often she had seen appellant before Wilkerson's death, whether she used drugs by herself before doing drugs with Wilkerson the night of his death, how much of the masked assailant's lower face and neck were visible, whether she saw the masked assailant without his mask, whether the masked assailant told Wilkerson the attack was revenge for the baby being 'messed up', whether the masked assailant wrapped the bag around Wilkerson's head for seven to ten versus 30 to 45 minutes, whether the masked assailant ransacked the shed for 45 minutes versus 90 to 120 minutes, and whether she told China that appellant killed Wilkerson."

### 3. *Blaxton's Proffer and Cooperation Agreements*

The People initially included Blaxton as appellant's codefendant on the charges of murder, robbery, and burglary. In January 2018, the People and Blaxton entered into a proffer agreement. The People agreed to refrain from using Blaxton's statements during the proffer session in its case-in-chief against him, in exchange for Blaxton's promise to respond "truthfully and completely" to all questions during the session. In March 2018, after the proffer session, the People and Blaxton entered into a cooperation agreement. Blaxton promised to "testify truthfully and completely" throughout the proceedings in exchange for the People's agreement to a plea deal, under which Blaxton would plead guilty to robbery and be sentenced to eight years in prison. The cooperation agreement provided, "The issue of whether or not Timothy Blaxton has in fact testified truthfully and completely will be decided by a neutral magistrate." It further provided that if Blaxton failed to testify truthfully, the People would have the right to declare the agreement void and proceed to trial against Blaxton on all charges.

During opening statements, the prosecutor summarized Blaxton's anticipated testimony. Appellant's counsel then challenged Blaxton's credibility on the ground that he would be testifying in exchange for a lenient plea deal. Counsel informed the jury that "in order to get this deal," Blaxton had "[m]iracuously" provided details to the

prosecution that he had claimed not to know or remember in an earlier police interview.

On direct examination, Blaxton confirmed he had entered the proffer and cooperation agreements, which were admitted into evidence. The prosecutor elicited testimony about the cooperation agreement's terms as follows:

"Q. And in this document, it tells you that for your truthful testimony, you will plead to one count of residential robbery and you will get eight years in state prison?

"A. Yes.

"Q. As part of your agreement as stated in this document, you were required to tell the truth?

"A. Yes.

"Q. Also stated in this document is that if you don't tell the truth, you could end up with charges against you?

"A. Yes.

"Q. It also states in this document that the truthfulness of your statements is not decided on by the District Attorney's Office, but by a neutral judge; is that right?

"A. Yes."

#### 4. *Blaxton's Identification of Appellant*

Blaxton testified that around 4:30 on the morning of Wilkerson's death, he visited Wilkerson's home to buy drugs. He saw appellant using drugs outside. Wilkerson allowed Blaxton inside, where Waters was present too, and they completed the transaction. When Blaxton exited the shed, appellant suddenly entered. Looking back inside the shed, Blaxton could no longer see Wilkerson or Waters; it was as if they had "vanished." He immediately left the scene.

Blaxton further testified that appellant had robbed Wilkerson on a prior occasion, during which Blaxton had seen appellant punch Wilkerson in the head.[3] On cross-examination, he admitted that during his proffer session, a detective asked him whether he had been present during this prior robbery, and he said no. He explained that he "didn't give a damn" about the detective's questions during the proffer session because he resented the detective for interrogating him earlier. He initially claimed his promise to tell the truth did not apply to the detective's questions, before admitting it did.

---

[3] A detective testified that during an interrogation the day after Wilkerson's death, Blaxton reported seeing, on a visit to Wilkerson's home around the time of his death, a man who had previously robbed Wilkerson. Though he did not then identify that man, he told the detective he believed appellant was responsible for Wilkerson's death.

**B.** *Defense Case*

Appellant called only one witness, his longtime friend Murray Wallace.  Wallace, who was confined to a wheelchair, testified he was living in the back unit of appellant's home on the morning of Wilkerson's death.  He claimed he saw appellant cooking breakfast in the front unit's kitchen sometime between 3:00 and 5:00 that morning.

On cross-examination, Wallace testified that appellant's grandson had delivered Wallace's breakfast to him in the back unit, from which Wallace was unable to see the front unit, and in which he had remained until 10:00 a.m. Wallace acknowledged he had long known of appellant's arrest, but when asked if he had ever contacted the police to tell them he had seen appellant at home around the time of the charged offenses, Wallace responded, "I was [a]sleep."

**C.** *Jury Instructions and Closing Arguments*

The court instructed the jurors (per CALCRIM No. 200), "It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial."  The court further instructed the jurors (per CALCRIM No. 226), "You alone must judge the credibility or believability of the witnesses."  The court identified various factors for the jury to consider in evaluating a witness's credibility, including whether the witness had been "promised immunity or leniency in exchange for his or her testimony[.]"  The court delivered no

10

instruction on aiding and abetting, or any other theory of vicarious liability.

In closing, the prosecutor argued that appellant committed burglary by entering Wilkerson's home with the intent to murder and rob him, and that appellant did, in fact, murder and rob Wilkerson. She summarized the physical evidence, including the presence of appellant's hair on Wilkerson's bloody hand, and Waters's testimony. She reminded the jury that Blaxton, beginning the day after the killing, had indicated appellant was present at Wilkerson's home. She argued, "[H]is version of what happened is pretty consistent with Ms. Waters's testimony, except for one glaring thing, of course. He did not say he took the victim's drugs." Characterizing Blaxton as an "opportunist," she argued Blaxton had taken advantage of appellant's attack on Wilkerson to steal drugs.

Appellant's counsel conceded Wallace's alibi testimony was weak, but argued the prosecution had nevertheless failed to prove beyond a reasonable doubt that appellant was present at Wilkerson's home at the time of the charged offenses. He argued Waters was not credible for various reasons, including the absence of evidence of appellant's DNA on the bag he allegedly used to suffocate Wilkerson. He argued Blaxton was not credible because he had been offered a "huge discount" on his sentence in exchange for his testimony, leading him to "say anything and everything to make it happen." He argued Blaxton had violated his promise to tell the truth by lying that he had seen appellant

11

rob Wilkerson on a prior occasion (as evidenced by the detective's testimony that during the proffer session, Blaxton had denied being present on that occasion).

In rebuttal, the prosecutor again acknowledged that although Blaxton had denied taking anything from Wilkerson, he "[p]robably took something. After all, he pled to a robbery and took eight years." She argued Blaxton was nevertheless credible on other matters because he had admitted being present at the scene of the killing, and he had not fabricated details to conform his account to Waters's. She argued Blaxton and Waters corroborated each other regarding appellant's presence in Wilkerson's home.

### D. *Verdicts and New Trial Motion*

The jury acquitted appellant of murder and robbery, but convicted him of first degree burglary. It found true the allegation that appellant knew or reasonably should have known that Wilkerson, the victim of the burglary, was over 65 years old.

Appellant filed a motion for a new trial pursuant to Penal Code section 1181. He argued the evidence of burglary was insufficient because the only person who placed him at the scene was Blaxton, whose testimony was neither credible nor corroborated by other evidence. In a written opposition to the motion, the People argued the burglary conviction was supported not only by Blaxton's testimony, but also by the DNA evidence and Waters's testimony.

After hearing oral argument from both parties, the court tentatively denied the new trial motion and invited appellant's counsel to respond. Appellant's counsel argued that if appellant had suffocated Wilkerson with a plastic bag as Waters claimed, appellant's DNA would have been found on the bag. The court responded, "And I agree with you on that point, [counsel]. I believe that is why the jurors did not convict him of the murder because his DNA was not found on the plastic bag because of the different inconsistent statements that Mr. Blaxton gave. [¶] I think the jurors struggled with who actually murdered the victim, whether it was [appellant] or whether it was Mr. Blaxton. [¶] And so since you're asking me to sit as the thirteenth juror, I come to that same determination. . . . [¶] . . . I have no doubt that [appellant] was present. And I have no doubt, based on Mr. Blaxton's statements, as the People have indicated from the very beginning, putting [appellant] there. [¶] . . . [¶] . . . We do have the other witness, Ms. Waters, who testified and ultimately stated that it was [appellant] there. [¶] . . . [¶] Look at the coroner's photographs. The hair was intertwined with the victim's fingers and the victim's fingers were bloody. [¶] . . . [That] indicates to me, as well as I think it indicated to the jurors, that he was there, that he participated in the burglary. At some point he participated maybe even in a struggle with the victim. [¶] They just couldn't determine as to whether or not he was the one who actually killed the victim or if it was Mr. Blaxton who actually killed the victim on this incident. [¶] So I have, basically, the same view as

the thirteenth juror in analyzing and assessing the evidence as they did. And I think that they came to the correct verdict in this case. [¶] So your motion for a new trial is denied."

### E. *Sentencing*

At appellant's April 2019 sentencing hearing, he admitted four of the eight prior prison terms the People had alleged. The People requested the maximum sentence of 11 years, comprising the upper term of six years for the burglary conviction, a one-year enhancement for the elder-victim finding, and four one-year enhancements for the admitted prior prison terms. Appellant requested a three-year sentence, relying in part on the nonviolent nature of his admittedly "lengthy" criminal history. He also relied on the following assertedly mitigating factors: (1) a history of family trauma and drug abuse; (2) familial connections, evidenced by letters of support attached to his sentencing memorandum; and (3) a history of steady employment (interrupted only by periods of incarceration), including nearly 10 years as a cook and more than 10 years as an in-home care provider.

The court sentenced appellant to the maximum term of 11 years, as requested by the People. It explained its decision to impose the upper term on the burglary conviction as follows: "The reason for that, that although the jurors -- and we'll never know, actually, who murdered the victim in this case, Mr. Wilkerson. [¶] But the jurors determined that

14

you were present during the time that Mr. Wilkerson was murdered during the time the residential burglary was committed.  [¶]  We have an individual who lost his life during that time.  The court is aware that there was a co-defendant that took an earlier plea and testified in this case.  [¶] And I believe that based on all the evidence, and the incredible job that your attorney did during the trial, is that the jurors could not figure out who actually was responsible between you and Mr. Blaxton for the actual murder of Mr. Wilkerson in this case."

The court ordered appellant to pay $870, comprising a $500 victim restitution order, a $300 restitution fine, a $30 criminal conviction fee, and a $40 court security fee. Appellant did not object on the ground of inability to pay. He timely appealed.

## DISCUSSION

Appellant contends:  (1) no substantial evidence supported his burglary conviction; (2) his trial counsel was unconstitutionally ineffective in failing to object to the admission of the cooperation agreement's terms concerning the prospective review of Blaxton's truthfulness; (3) S.B. 136 requires that we strike his one-year enhancements for prior prison terms, and the striking of the enhancements requires that we remand for resentencing; and (4) the trial court violated his due process and Eighth Amendment rights by ordering him to pay $870 without determining his ability to

15

pay, or his counsel was ineffective in failing to object on the ground of inability to pay.

### A. *Sufficiency of the Evidence of Burglary*

There was substantial evidence that appellant committed burglary by entering Wilkerson's home with the intent to commit murder or robbery. (See Pen. Code, § 459 [burglary requires entry into dwelling or other specified structure with intent to commit larceny or any felony]; *People v. Davis* (2013) 57 Cal.4th 353, 357 ["'In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt'"].) As the trial court found in denying appellant's motion for a new trial, the following evidence supported reasonable inferences that appellant was present during Wilkerson's killing and participated in a struggle with him: (1) Waters testified that appellant barged into the shed when Blaxton duped Wilkerson into opening the door; (2) beginning the day after the killing, Blaxton indicated appellant was present at the scene; and (3) appellant's DNA was found on a hair intertwined with Wilkerson's bloody fingers. Moreover, Blaxton testified that appellant had robbed Wilkerson on a prior occasion, and Waters testified that both appellant and Blaxton took property from Wilkerson's shed, and that after the attack appellant demanded "'Where['s] the money?'" Finally, evidence that appellant told Waters he was

16

attacking Wilkerson because his baby was "'messed up,'" along with evidence that his pregnant girlfriend had obtained drugs from Wilkerson, suggested appellant harbored animosity toward Wilkerson for his role in a drug-induced problem with his girlfriend's pregnancy. The jury reasonably could have inferred from this evidence that appellant entered with the intent to murder or rob Wilkerson.

Appellant argues we must review the sufficiency of the evidence of burglary "in the light most favorable to an acquittal of robbery and murder . . . ." Not so. The verdict on the burglary count -- and our review of the evidence underlying it -- is independent of the verdicts on the other counts. (See *People v. Lewis* (2001) 25 Cal.4th 610, 656 (*Lewis*) ["'Sufficiency-of-the-evidence review . . . should be independent of the jury's determination that evidence on another count was insufficient'"]; *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1657 (*Pahl*) ["each count must stand on its own, and a verdict on one has no bearing on any other"].) As noted, there was substantial evidence appellant committed burglary.

Contrary to appellant's alternative suggestion, there is no inconsistency between a burglary conviction based on the substantial evidence he intended to murder or rob Wilkerson and his acquittal on the murder and robbery charges. The jury reasonably might have found he and Blaxton each entered with the intent to murder or rob Wilkerson (thereby committing burglary), but there was a reasonable doubt

17

regarding which man personally murdered or robbed him. Such doubt would have compelled the jury to acquit appellant on the murder and robbery charges, as the jury had not been instructed on any theory of vicarious liability. Further, in light of appellant's challenges to Waters's credibility, and the absence of evidence that Wilkerson's property was found in appellant's possession, the jury reasonably might have found a reasonable doubt whether appellant completed the intended robbery.

In any event, even assuming arguendo that the jury convicted appellant of burglary on a factual theory inconsistent with the acquittals on the murder and robbery counts, that inconsistency does not entitle appellant to relief. (See, e.g., *People v. Bell* (2020) 48 Cal.App.5th 1, 9-10, 14-15 [affirming murder conviction on basis of substantial evidence that defendant fatally drove van over victim, notwithstanding inconsistency between conviction on that basis and defendant's acquittal on charge of hit and run causing death]; *Lewis, supra,* 25 Cal.4th at 654-656 [even assuming not-true finding on allegation of great bodily injury in course of robbery was inconsistent with true findings on allegations of such injury in course of burglary and attempted murder, inconsistency did not warrant reversal].) *In re Johnston* (1935) 3 Cal.2d 32, a conspiracy case on which appellant relies, established an exception to the general rule that inconsistent verdicts do not entitle a defendant to relief on appeal. (See *id.* at 36.) That exception, however, applies "only where, as in *Johnston,* an overt act alleged in a

18

conspiracy charge is identical to another charged offense of which defendant is acquitted." (*Pahl, supra,* 226 Cal.App.3d at 1658; cf. *Lewis, supra,* at 656 [citing *Pahl* with approval regarding general rule allowing inconsistent verdicts]; *People v. Palmer* (2001) 24 Cal.4th 856, 861 [same]; *People v. Santamaria* (1994) 8 Cal.4th 903, 911 [same]; 6 Witkin, Cal. Criminal Law (4th ed. 2020) § 87 [discussing *Johnston* exception as a "[s]pecial" rule regarding conspiracy cases].) Appellant identifies no nonconspiracy case applying the exception.

## B. *Counsel's Failure to Object to Asserted Vouching*

Appellant contends his trial counsel was unconstitutionally ineffective in failing to object, on the ground of improper vouching, to the admission of evidence that Blaxton's cooperation agreement provided that (1) a neutral judge would determine whether Blaxton testified truthfully, and (2) the prosecution could revoke Blaxton's lenient plea deal if he did not.[4]

---

[4] Appellant concedes the admissibility of all other terms of the cooperation agreement, including Blaxton's promise to testify truthfully. Further, he implicitly concedes his trial counsel's failure to raise a vouching objection forfeited a contention of prosecutorial misconduct on appeal. (See, e.g., *People v. Flores* (2020) 9 Cal.5th 371, 403.) Though he is silent on the subject, his counsel's failure to object on this ground also forfeited a contention of evidentiary error. (See, e.g., *People v. Redd* (2010) 48 Cal.4th 691, 729.)

### 1. *Principles*

"'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the [prosecutor's] argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.'" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*); see also *id.* at 483 [implying reliance on prestige of other government agents is likewise improper].) "[A]s [several California Supreme Court decisions] all demonstrate . . . it is *not* misconduct for the prosecutor to address the obvious credibility issue that will necessarily arise when an accomplice or similarly involved witness testifies in exchange for a plea agreement by eliciting the term of the agreement requiring the witness to testify to the truth rather than in favor of one side or the other. That is not 'vouching' in the sense of placing the prestige of the government behind the witness; rather, it is fairly informing the jury of the nature and limitations of the inducement offered. That a jury may infer the prosecutor believes the witness is testifying truthfully does not mean there has been misconduct. There is misconduct only if the prosecutor's questions or arguments suggest his or her belief in the witness's veracity is based on information to which the jury is not privy or otherwise encourage the jury to rely on the prosecutor's belief rather than assessing the witness's

credibility for itself." (*People v. Price* (2017) 8 Cal.App.5th 409, 464 (*Price*).)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' [Citation.] To make out an ineffective assistance claim on the basis of the trial record, the defendant must show '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)

### 2. *Analysis*

No impermissible vouching occurred. The prosecutor merely moved the cooperation agreement into evidence, and elicited testimony from Blaxton confirming the existence of the challenged terms. Neither the prosecutor, Blaxton, nor the agreement itself implied that Blaxton's truthfulness had been reviewed or guaranteed. Thus, appellant misrepresents the evidence in arguing it conveyed an impression that Blaxton's truthfulness "had been vetted." While the agreement provided for a judge's *prospective*

review of Blaxton's truthfulness, no evidence suggested the judge would find him truthful.  Indeed, in closing argument, the prosecutor -- far from personally vouching for Blaxton -- argued that part of his testimony had been false.  Specifically, she argued that Blaxton had taken advantage of appellant's assault on Wilkerson to steal Wilkerson's drugs (as suggested by his guilty plea to robbery), contradicting his testimony that he had left as soon as appellant attacked.  Thus, the jury was not invited to credit Blaxton's testimony in reliance on information outside the record or the prestige of the prosecution or judiciary.  Under our Supreme Court's precedent, appellant's counsel had no ground to raise a vouching objection.  (See *Rodriguez*, *supra*, 9 Cal.5th at 480, 483; *Price*, *supra*, 8 Cal.App.5th at 459, 465.)  Accordingly, counsel's failure to raise a meritless vouching objection was a reasonable tactical decision.[5]

---

[5]  The same is true under *United States v. Wallace* (9th Cir. 1988) 848 F.2d 1464 and the related Ninth Circuit precedent on which appellant relies.  Appellant maintains the challenged terms impermissibly vouched for Blaxton under this precedent because they were introduced "before the witness's credibility [was] attacked."  The premise is false; Blaxton's credibility was attacked during opening statements, when appellant's counsel informed the jury that Blaxton had agreed to testify in exchange for a lenient sentence.  In similar circumstances, the Ninth Circuit found no impermissible vouching.  (See *U.S. v. Dorsey* (9th Cir. 2012) 677 F.3d 944, 953-954 ["Defense counsel implied in his opening statement that [defendant] was a liar and that he was biased because he got 'a deal from the government.'  The prosecutor permissibly responded to this attack by eliciting
*(Fn. is continued on the next page.)*

In any event, even were we to assume the challenged terms would have been excluded had counsel objected, the record shows no prejudice from the failure to object. The jury had ample reason to discredit Blaxton's testimony, notwithstanding a neutral judge's prospective review of his truthfulness. Blaxton himself acknowledged giving little weight to his promises to tell the truth, and the prosecutor questioned his veracity in closing argument. Appellant's counsel similarly challenged Blaxton's credibility, arguing that he would say anything to obtain the benefit of his lenient plea deal. The jury was instructed that it "alone" must evaluate Blaxton's credibility, based on the evidence presented at trial and specified factors, including the factor that he was promised leniency in exchange for his testimony. "We presume the jurors understood and followed the court's instruction." (*People v. Frederickson* (2020) 8 Cal.5th 963, 1024.) The presumption is bolstered by evidence that the jury rejected Blaxton's testimony in whole or in part, viz., its acquittal of appellant on the murder charge despite Blaxton's implicit identification of appellant as the murderer. We find no reasonable probability that exclusion of the challenged terms would have led the jury to further discredit Blaxton's testimony in a manner affecting the verdict. In sum, no impermissible vouching occurred, and appellant's

testimony that [defendant]'s plea agreement required him to tell the truth. When the defense opens a door, it should not be surprised to see the prosecutor enter"]; accord, *U.S. v. Adebimpe* (9th Cir. 2016) 649 Fed.Appx. 449, 454-455.)

23

counsel was not ineffective in failing to raise a meritless vouching objection.

### C. *Fines, Fees, and Victim Restitution*

Appellant contends the trial court violated his due process and Eighth Amendment rights by ordering him to pay $500 in victim restitution and $370 in fines and fees without first determining his ability to pay; alternatively, he contends his trial counsel was unconstitutionally ineffective in failing to object on the ground of inability to pay.  He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which concerned fines and fees, and argues we should extend that case's conclusions to victim restitution.

Appellant forfeited his *Dueñas* contention by failing to object in the trial court on the ground of inability to pay. (See, e.g., *People v. Torres* (2020) 47 Cal.App.5th 984, 991.) We note *Dueñas* was decided three months before appellant's April 2019 sentencing hearing.

Appellant's ineffective assistance claim fails because the record does not negate the possibility his counsel had rational tactical reasons for failing to object.  (See *People v. Hoyt, supra*, 8 Cal.5th at 958.)  Counsel reasonably might have concluded that *Dueñas* did not support an objection to victim restitution, as courts have since held.  (See *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["Based on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*, we decline to extend the rule of *Dueñas* to victim restitution"]; accord,

24

*People v. Allen* (2019) 41 Cal.App.5th 312, 326.) Moreover, in mitigation, appellant's counsel argued that appellant had maintained steady employment -- including nearly 10 years as a cook and more than a decade as an in-home caregiver -- since he was 18 years old, interrupted only by periods of incarceration. In light of appellant's employment history and its potential to mitigate his sentence, his counsel reasonably might have deemed an objection based on inability to pay $370 in fines and fees futile, or even counterproductive.

### D. *Appropriate Disposition Under S.B. 136*

As the parties agree, appellant's four one-year enhancements for prior prison terms must be stricken under S.B. 136, as none of his prior prison terms were served for sexually violent felonies. (See Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.) The parties disagree whether we should affirm the judgment as modified by the striking of the enhancements, or remand for resentencing. Appellant contends we must remand because he "might be able to present mitigating evidence at a resentencing hearing based on his [post-sentencing] conduct in prison." He identifies no such evidence.

We find remand for resentencing unnecessary because the trial court imposed the maximum possible sentence. (See *People v. Gastelum* (2020) 45 Cal.App.5th 757, 772-773; *People v. Winn* (2020) 44 Cal.App.5th 859, 872-873; *People v.*

25

*Lopez* (2019) 42 Cal.App.5th 337, 341-342.)[6] Had the court exercised leniency on any component of the sentence, remand might be warranted to afford the court an opportunity to adjust that component upward, for the purpose of maintaining the original aggregate sentence or achieving its closest possible approximation. (See *People v. Hill* (1986) 185 Cal.App.3d 831, 834 [at resentencing, trial court is entitled to rethink entire sentence "to achieve its original and presumably unchanged goal"].) But the court exercised no leniency; it imposed the upper term on appellant's conviction, alongside the stricken enhancements and the remaining elder-victim enhancement. We will achieve the court's presumably unchanged goal of imposing the maximum sentence by striking the enhancements for prior prison terms and affirming the judgment as so modified.

We are unaware of any authority supporting appellant's position that he is entitled to resentencing based on mere speculation that he "might" present mitigating evidence of his post-sentencing conduct. Though appellant cites cases supporting the proposition that such evidence is

---

[6] In *People v. Chubbuck* (2019) 43 Cal.App.5th 1, on which appellant relies, the Court of Appeal did not discuss whether remand under S.B. 136 was necessary in light of the original sentence (which appeared to be the maximum). (*People v. Chubbuck, supra,* at 3-4, 13-14.) "'"[C]ases are not authority for propositions not considered."'" (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 11.)

entitled to consideration if a defendant is resentenced, those cases do not address an entitlement to resentencing in the first instance. (See *Pepper v. United States* (2011) 562 U.S. 476, 481; *People v. Bullock* (1994) 26 Cal.App.4th 985, 990; *People v. Tatlis* (1991) 230 Cal.App.3d 1266, 1273-1274; *People v. Warren* (1986) 179 Cal.App.3d 676, 687; *People v. Foley* (1985) 170 Cal.App.3d 1039, 1047-1049.) Moreover, appellant's cases suggest that remand for consideration of such evidence is unwarranted where it would be futile. (Cf. *People v. Bullock, supra*, at 989-990 [evidence of post-sentencing conduct may be compelling reason to order new probation report at resentencing even where defendant is ineligible for probation, but "in many cases obtaining a new report will be a meaningless exercise," and trial court has discretion not to order one]; *People v. Tatlis, supra*, at 1274-1275 [trial court's error in failing to obtain new probation report for resentencing was prejudicial, where defendant's concurrently filed habeas petition identified evidence of post-sentencing rehabilitation of "sufficient substance . . . to create a reasonable probability [it would] affect the sentencing calculus favorably"]; *People v. Foley, supra*, at 1049-1050 [same, where trial court deemed defendant's post-sentencing testimony in separate case mitigating, but declined to rely on it because Department of Corrections should have administratively reduced sentence, and new report might reveal Department had failed to do so].)

Here, the record suggests remand would be futile. In his sentencing memorandum and attached letters of support,

27

appellant presented assertedly mitigating evidence of his employment (between prior periods of incarceration), familial connections, and personal history of family trauma and drug abuse. The court nevertheless imposed the upper term, relying on the nature of the trial evidence and verdicts. Neither the record nor appellant's speculation that he "might" present new personal information establishes any reasonable probability the court would reduce his sentence on remand. Thus, even under the authority cited by appellant, remand for resentencing is unwarranted.

## DISPOSITION

The four one-year sentence enhancements under Penal Code section 667.5 are stricken. The judgment is affirmed as modified by the striking of the enhancements. The trial court shall issue an amended abstract of judgment and forward it to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.

29